244 N.J. Super. 553 (1990)
582 A.2d 1295
THE TRUST COMPANY OF NEW JERSEY, A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT,
v.
THE PLANNING BOARD OF THE BOROUGH OF FREEHOLD, COLONIAL STATE BANK, A NEW JERSEY CORPORATION, AND THE MAYOR AND COUNCIL OF THE BOROUGH OF FREEHOLD, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Submitted October 9, 1990.
Decided December 7, 1990.
*555 Before Judges J.H. COLEMAN, ASHBEY and LANDAU.
Bathgate, Wegener, Wouters & Neumann, attorneys for appellant (Thaddeus R. Maciag, of counsel; Howard P. Lakind and Thaddeus R. Maciag, on the brief).
Cerrato, Dawes, Collins, Saker & Brown, attorneys for respondent Colonial State Bank (Kerry E. Higgins, on the brief).
Lomurro, Davison, Eastman & Munoz, attorneys for Freehold Borough Planning Board (Duane O. Davison, of counsel and on the brief).
Joseph D. Youssouf, attorney for Mayor and Council for the Borough of Freehold (Joseph D. Youssouf, on the brief).
The opinion of the court was delivered by ASHBEY, J.A.D.
In this land-use case, plaintiff Trust Company of New Jersey (Trust Company) appeals from the dismissal of its complaint in lieu of prerogative writs against defendants Planning Board of the Borough of Freehold (Board), the Borough's Mayor and Council, and Colonial State Bank (Colonial State). By its June 1989 dismissal, the Law Division sustained the Board's grant of site plan approval to Colonial State for the construction of a temporary, and ultimately permanent, drive-in bank. The Law *556 Division also validated the existing construction of the temporary bank.
This matter has a tortured history. In 1986 Colonial State approached the Board and, apparently, the Mayor and Council, as the contract purchaser of four lots on the tax map.[1] The lots were located at the northeast corner of the intersection of two State highways, Highway # 79 and Highway # 33. At that time three of those lots, the ones closest to the intersection, were zoned B-1, the terms of which we will later detail. The fourth lot was zoned residential. Trust Company, also a bank, is located directly opposite, on the northwest corner of the intersection.[2]
On May 5, 1986, the Mayor and Council of the Borough of Freehold passed and published an ordinance which rezoned the fourth lot (# 13) from its then residential zoning to the borough's B-1 zone, thereby including the entire corner parcel in the B-1 zone. Colonial State applied for site plan approval for its new bank, which was granted. That action was ultimately reversed on Trust Company's prerogative writs action, primarily because a Board member, James Higgins, was related to a lawyer in a law firm which represented Colonial State. In the meantime, the temporary bank had been built. Colonial's 1988 application for site plan approval for its bank was thus Colonial State's second application.
The primary substantial question before the Law Division in the present action was whether Colonial State needed a non-conforming use variance from the Board of Adjustment before it was entitled to site plan approval. See N.J.S.A. 40:55D-70d. *557 The following are the relevant provisions of the Freehold zoning ordinance as of 1986:
FREEHOLD ZONING ORDINANCE
19-9 B-1 Office Commercial District.
The following regulations shall apply to all B-1 Districts:
19-9.1 Principal Uses and Buildings Permitted

a. Office Commercial District facilities may include uses such as and similar to the following types: Physician, attorney, dentist, minister, chiropractor, chiropodist, osteopath, accountant, bookkeeper, architect, insurance agent, real estate broker, or other member of a similar profession or occupation.

b. The studio of a teacher of music, dancing or art.
c. The studio of a photographer.
d. Undertaking establishment.
19-9.2 Accessory Uses and Buildings Permitted. Private garages, provided such structures shall not provide space to exceed space for six automobiles, or three automobiles and three commercial vehicles of not more than two tons each in gross weight.
19-9.5 Prohibited Uses and Buildings. Any use not set forth in subsections 19-9.1 and 19-9.2, and specifically uses such as barber shops, beauty parlors and other uses generating traffic and parking and uses primarily engaged in the sale of merchandise from the premises.... [Emphasis added.]
* * * * * * * *
19-10 B-2 General Commercial District.

The following regulation shall apply to all B-2 districts.
19-10.1 Principal Uses and Buildings Permitted.

a. The sale of retail goods such as but not necessarily limited to the following types: Grocery stores, meat and poultry stores, drug stores, variety stores, glass and aluminum stores, drygoods stores, baked good stores, packaged liquor stores and taverns, flower stores, confectionery stores, household supply stores, stationery supplies stores, haberdashery, apparel stores and department stores.
b. The provision of service establishments such as but not limited to the following types: Barber or beauty shops, clothes cleaning and laundry pick-up establishments, shoe repair shops, business and professional offices, restaurants, luncheonettes and eating places.
c. Automobile parking areas.

*558 d. Shopping center developments containing the types of retail and service establishments as listed above, including automobile parking areas. [Emphasis added.]
The 1986 ordinance, # 975, rezoning lot # 13, provided:
WHEREAS, the Mayor and Council of the Borough of Freehold have received a formal request to re-zone property known and identified as Block 106, Lots 1, 2, 12 and 13, on the tax map of the Borough of Freehold, said property being located adjacent to State Highway # 33 and South Street [State Highway # 79] on the northeastern corner of said intersection; and
WHEREAS, the contract purchasers of said property proposed to construct a bank facility on said property; and
WHEREAS, a portion of said property is currently located in the R5 residential zone thereby rendering that portion of the property unusable for a commercial enterprise; and
WHEREAS, a portion of said property is located in the B1 zone, which zone permits commercial uses and professional uses such as a bank facility; and
WHEREAS, the Mayor and Council of the Borough of Freehold are of the opinion that the re-zoning of said property to accommodate this proposed development is in the best interests of the Borough of Freehold because the property in question is ideally suited for commercial utilization and commercial utilization of said property will result in increased tax ratables; and
WHEREAS, the Mayor and Council of the Borough of Freehold do, by this ordinance intend to re-zone said property from the R5 to the B1 zone.
NOW, THEREFORE, BE IT ORDAINED as follows:

ARTICLE ONE: Section 19-3.2 entitled "Maps and Boundaries" is hereby amended to include property known and identified as Block 106 Lots 1, 2, 12 and 13 in the B1 zone representing a transfer of a portion of said property from the R5 zone. [Emphasis added.]

THE 1988 ORDINANCE
During the Colonial State 1988 site plan approval hearings a controversy developed concerning whether this 1986 ordinance, if valid, made the proposed banking use conforming. Trust Company contended that banks were not permitted in the B-1 zone, and, therefore, even if Colonial State's entire parcel was properly placed in that zone, the proposed bank would require a variance. The municipality then passed another ordinance, # 1043, which unequivocally declared that banks were permitted in the B-1 zone.

*559 SECTION 19-9.1 PRINCIPAL USES AND BUILDINGS PERMITTED.
A) The office of a member of a recognized profession such as physicians, attorneys, dentists, ministers, chiropractors, architects, engineers, accountants, insurance agents, real estate brokers, stockbrokers and other generally recognized professional service personnel or organizations.
B) Banks, funeral homes, photograph studios, music, dance or art studios.
In response to the Board's argument before the Law Division that the passage of this ordinance made moot any question about whether the banking use was permitted in the B-1 zone, plaintiff asserted that the 1988 ordinance was invalid because two members of the Board who voted when the ordinance was referred to it by the Mayor and Council had a conflict of interest in violation of N.J.S.A. 40:55D-23(b). Although the judge found otherwise, and did not rely on the 1988 ordinance to validate the actions of the Board, we agree with plaintiff on this point. It was undisputed that Board member James Higgins' niece, Kerry Higgins, and Board member Bret Winters' father-in-law, Dominick Cerrato, were an associate and partner respectively of the law firm which represented Colonial State. N.J.S.A. 40:55D-23(b) provides:
No member of the planning board shall be permitted to act on any matter in which he has, either directly or indirectly, any personal or financial interest.
A copy of the June 22, 1988 Board "Resolution Recommending [to the governing body] Adoption" of the June 6, 1988 ordinance amendment shows that Mr. Winters voted for the amendment and Mr. Higgins voted both for and against it.[3] The minutes of the July 18, 1988 meeting of the Mayor and Council specifically referred to the Board approval and directed that the Board approval be filed with the vote of the governing body.
We reject defendant Board's argument that there was no taint in the Board's vote in favor of the ordinance because the Board had previously ruled on Colonial State's application, or because the Board's approval of the site plan, although *560 memorialized on June 22, 1988, could only be voted on by Board members who voted earlier. These procedural niceties do not change the potential for conflict, including psychological influences. Although neither Higgins nor Winters voted as Council members on the 1988 ordinance, nor as Board members on the Colonial State's site plan approval application, disqualified Board members did participate when the Planning Board recommended the 1988 ordinance to the Mayor and Council. The Mayor and Council relied on the Board action. The ordinance was thus tainted and could have no effect upon the validity of Colonial State's site plan approval. See Barrett v. Union Tp. Committee, 230 N.J. Super. 195, 201, 553 A.2d 62 (App.Div. 1989); Zell v. Borough of Roseland, 42 N.J. Super. 75, 82, 125 A.2d 890 (App.Div. 1956). The disposition of this appeal thus rests entirely on the judge's primary analysis that the 1986 ordinance effectively rezoned lot # 13 as B-1, that banking was a permitted use in B-1, and that any incidental variances were properly granted by the Board.

THE 1986 ORDINANCE
Trust Company argued before the judge that the 1986 ordinance was invalid for procedural reasons, although publication was a matter of record. The judge found that plaintiff's unsupported procedural challenge was time-barred, having occurred some two years after the 1986 ordinance. See R. 4:69-6. We agree. We also agree that the filing of the 1986 ordinance with the County Planning Board, although delayed, was not a bar to its effectiveness.
The judge also found that the 1986 legislation preamble expressed an intent that banks be included in zone B-1. Plaintiff urges that we reject that finding, relying on PRB Enterprises, Inc. v. South Brunswick Planning Board, 105 N.J. 1, 5-6, 518 A.2d 1099 (1987). However, PRB does not hold that the preamble language of a municipal ordinance may not be used to infer municipal intent. On the contrary, the Supreme Court held that the standard there expressed was intended to *561 be substantive law, but was not precise enough to be effective. Ibid. The Court observed that a preamble traditionally sets out the conditions prompting the legislation.[4] We are satisfied that the 1986 ordinance expressly included lot # 13 in the B-1 zone and its preamble interpreted its zoning ordinance as one of the conditions prompting the legislation. The question is whether the preamble was a valid expression of a general understanding of the meaning of the zoning ordinance and whether the zoning change served a valid municipal purpose.
These questions are related. We first consider whether the record supported the judge's conclusion that there was a valid municipal purpose in making the zoning change. No one urges any legislative or constitutional reason that the municipality could not change the boundaries of its zones on its zoning map. Trust Company contends that the 1986 ordinance constituted "spot zoning," because the Mayor and Council intended to benefit Colonial State and not the municipality.
Without reference to the term "spot zoning," the Supreme Court reviewed the applicable law in Riggs v. Long Beach Tp., 101 N.J. 515, 503 A.2d 284 (1986) (Riggs I) and Riggs v. Long Beach Tp., 109 N.J. 601, 538 A.2d 808 (1988) (Riggs II). In Riggs I the Supreme Court remanded the question of the validity of an ordinance which exclusively rezoned plaintiffs' property to the Appellate Division for reconsideration, noting
If, as the trial court found, the ordinance does affect only the one property, it is appropriate for the Court to address the legal question whether the ordinance legitimately serves the public interest. [101 N.J. at 526, 503 A.2d 284]
In Riggs II the Supreme Court held that, where the ordinance had the purpose to reduce the value of the property in furtherance of municipal intent to acquire it by eminent domain, it was invalid, but saying,

*562 A zoning ordinance is insulated from attack by a presumption of validity, which may be overcome by a showing that the ordinance is "clearly arbitrary, capricious or unreasonable, or plainly contrary to fundamental principles of zoning or the [zoning] statute." Bow & Arrow Manor v. Town of West Orange, 63 N.J. 335, 343 [307 A.2d 563] (1973); accord Zilinsky v. Zoning Bd. of Adjustment of Verona, 105 N.J. 363, 368 [521 A.2d 842] (1987); [Taxpayer Ass'n of Weymouth Township v.] Weymouth Township, supra, 80 N.J. [6] at 20 [364 A.2d 1016 (1976)]. The party attacking the ordinance bears the burden of overcoming the presumption, Ward v. Montgomery Township, 28 N.J. 529, 539 [147 A.2d 248] (1959); La-Rue v. East Brunswick [Tp.], 68 N.J. Super. 435, 454 [172 A.2d 691] (App.Div. 1961); and, in meeting the burden, that party may rely on extrinsic evidence, Bellington v. Township of East Windsor, 32 N.J. Super. 243, 248 [108 A.2d 179] (App.Div. 1954). Courts should not question the wisdom of an ordinance, and if the ordinance is debatable, it should be upheld. Bow & Arrow Manor, supra, 63 N.J. at 343 [307 A.2d 563]; see also Zilinsky, supra, 105 N.J. at 368-69 [521 A.2d 841] ("[a] mere difference of opinion as to how an ordinance will work will not lead to a conclusion of invalidity; `no discernible reason' is the requisite standard"). [109 N.J. at 610, 611, 538 A.2d 808]
Further, the Court was clear that, in determining whether an ordinance is adopted for an unlawful purpose, the courts must distinguish between the purpose of the ordinance and the motives of the members of the legislative body, saying
Courts generally will not inquire into legislative motive to impugn a facially valid ordinance, but will consider evidence about the legislative purpose `when the reasonableness of the enactment is not apparent on its face.' Clary v. Borough of Eatontown, 41 N.J. Super. 47, 71 [124 A.2d 54] (App.Div. 1956). [Id. 109 N.J. at 613, 538 A.2d 808]
The Court then addressed the nature of an inquiry into the municipality's true purpose, finally concluding that overwhelming evidence supported a finding that the Riggs ordinance served no valid zoning purpose and saying,
Our holding that the challenged ordinance is invalid need not preclude other municipalities from zoning other property more restrictively on a different set of facts. Here, however, the municipality simultaneously planned for open space and zoned for residential use. The purpose of the zoning amendment was not to fulfill the master plan, but to enable the municipality to pay the property owner less than fair market value under the preexisting zoning ordinance. [Id. 109 N.J. at 615, 538 A.2d 808]
As we observed earlier, in Riggs II the Supreme Court did not refer to "spot zoning" when it reversed our decision in Riggs v. Long Beach Tp., 212 N.J. Super. 69, 514 A.2d 45 (App.Div. 1986). There we noted that the primary use of the term was in *563 connection with selective restriction in the zoning, not in broadening the permitted uses. In any event, it is reasonably inferable that the difficulty with the "spot zoning" rubric is that it focuses on whether the parcel being rezoned is small or limited to one owner. Riggs v. Township of Long Beach, 212 N.J. Super. at 82, 514 A.2d 45. As the Supreme Court in Riggs I and II instructs us, we focus on whether there was evidence in the record to support the existence of a valid municipal reason for concluding that a new bank like Colonial State was a proper use at the intersection of Highway # 79 and Highway # 33. Related is the question of whether it was a generally accepted interpretation of the meaning of the zoning code that banks were permitted in the "professional" zone.
Respecting both issues, Trust Company contends that banking was clearly not permitted in B-1, but was arguably permitted in B-2. It is undisputed, however, that, prior to the passage of the invalid 1988 ordinance, the Freehold zoning ordinance, relevant portions of which we have detailed, at no point expressly permitted banks, or any financial institution, in any zone. Some form of interpretation was required in order to justify their inclusion anywhere in the borough. Yet, in the two zones about which the parties argued, B-1 and B-2, there were eight banks, of which plaintiff was one. Four of those banks were in the B-1 zone. At least one of those banks had been either built or expanded as a valid use in the B-1 zone. While plaintiff relied on the fact that building or expanding other banks now in B-1 had required variances, its planner testified that those variances had been obtained while the location of the bank had been zoned residential, after which the zone was changed to B-1. In other words, the variance to create a bank in a residential zone came first and zoning the area to B-1 came later. That pattern applied to Trust Company, the predecessor of which had been at the intersection in question since 1972.
We have no record of how banks came to be built in B-2. We do know that, despite the existence of the eight banks in the *564 two zones, the only evidence that there had been a municipal interpretation that B-1 did not include banks was a 1979 letter from its borough engineer. This letter preceded the 1980 Master Plan. There was no evidence in the record that any interpretation of the zoning code following the 1980 Master Plan suggested that banks or financial institutions were nonconforming uses in either zone B-1 or B-2.
Defendants point to the history in the record of variances permitting banks as demonstrating the reasonableness of the Mayor and Council, both in its conclusion that B-1 included banks, and that lot # 13 was properly placed in the B-1 zone. There were such variances in September 1970 and September 1972 (Trust Company). In 1984 a bank in B-1 was permitted to expand its banking use and not considered a nonconforming use (representation to Board by Trust Company Planner). Trust Company urges that this past history of granting variances as a justification for the 1986 zoning change is not relevant where the record demonstrates that the Mayor and Council engaged in a continuum of events between 1986 and 1988, which Trust Company characterizes as "surreptitious" and demonstrating an invalid purpose for both the 1986 and 1988 ordinance.
Our task is to determine whether the ordinance furthered a municipal purpose as defined in the Municipal Land Use Law, N.J.S.A. 40:55D-2 (MLUL). When passing ordinance # 975, the legislative body referred to increasing tax ratables. Such a purpose is not recognized in the MLUL. The ordinance also said the property was "ideally suited for commercial utilization." That reasoning must be judged in the light of the following valid municipal purposes:
a. To encourage municipal action to guide the appropriate use or development of all lands in this State, in a manner which will promote the public health, safety, morals, and general welfare;
* * * * * * * *
g. To provide sufficient space in appropriate locations for a variety of agricultural, residential, recreational, commercial and industrial uses and open *565 space both public and private, according to their respective environmental requirements in order to meet the needs of all New Jersey citizens;
h. To encourage the location and design of transportation routes which will promote the free flow of traffic while discouraging location of such facilities and routes which result in congestion or blight;
i. To promote a desirable visual environment through creative development techniques and good civic design and arrangement;
j. To promote the conservation of historic sites and districts, open space, energy resources and valuable natural resources in the State and to prevent urban sprawl and degradation of the environment through improper use of land; [N.J.S.A. 40:55D-2][5]
Most important, the MLUL requires that zoning ordinances regularly passed by the mayor and council be substantially consistent with the land use element of the master plan. N.J.S.A. 40:55D-62(a). Comparing the 1986 ordinance with the 1980 Freehold Master Plan is also required by Riggs II, where the Supreme Court observed that the asserted municipal purpose, preservation of open space, as designated in the master plan, was at odds with the actual zoning change. This impelled the Court to call the township's attempt "to link the reduction of lots to the designation of open space in the master plan is nothing more than a red herring to divert attention from the true purpose of the ordinance." 109 N.J. at 617, 538 A.2d 808.
The 1980 Freehold master planners were concerned about the "central business district" in downtown Freehold, both an historic area and the County seat.[6] According to the Master Plan (Plan), one of the major problems facing downtown Freehold was preserving its historic buildings, while promoting commercial growth in the face of existing development and downtown *566 traffic congestion. The Plan found that congestion resulted from a combination of factors, including:
a radial form of development which results in streets converging on Main Street [downtown].
[and]
inadequate off-street parking.
In its "Goals and Objectives," the Plan provided that the borough should
Provide opportunities for commercial, office professional and industrial growth, where appropriate.
Keeping in mind that in 1980 Trust Company was already at this intersection, one of the "minor adjustments" specifically approved of as fulfilling these goals and objectives was that
An Office Professional zone was established at the intersection of Park Avenue [Highway # 33] and South Street [Highway # 79]
Although the record on appeal contains maps of such density that discerning the elements of individual zones becomes almost impossible, it is clear that this intersection is not in downtown Freehold. Highway # 79 is one of the "spoke" arteries leading back to what the Plan called the "central business district." The intersection area was not residential in 1988, a fact which might be inferred from the Plan's specific reference to changing its zoning as early as 1980. We have already noted the uses at the intersection borders. On the map, the intersection is wide. The more intense commercial district, B-2, bordering Highway # 33, is east and south.
While a residential zone bordered the B-1 zone to the east, the Board's ultimate characterization of the entire neighborhood as consonant with commercial utilization was not disputed by the Trust Company, except in generalities. In fact, there was no residential objector to Colonial State's application. We conclude that adding one adjoining intersection lot to the Office  Professional zone accorded with N.J.S.A. 40:55D-62(a), as "substantially consistent with the land use plan element of the master plan or designed to effectuate such plan elements." We also conclude that providing a financial institution away *567 from the center of town and along one of its "spoke" arteries, with its own off-street parking, could not be described as antagonistic to the Plan.
We now turn to the municipality's construction of its zoning ordinance. In the case of Bern v. Borough of Fair Lawn, 65 N.J. Super. 435, 444-445, 168 A.2d 52 (App.Div. 1961), we held that proscription of a use must be stated with clarity. In this case the question concerns a broad interpretation of what was a permitted use. In the ordinance, the B-1 zoning, although labeled "office commercial," permitted uses "similar to professional." B-1 permitted studios and undertakers, and specifically excluded "barber shops."[7] B-2, labeled "general commercial," permitted uses "such as" "service establishments." B-2 permitted "business and professional offices" as well as "barber shops."
Trust Company argued that a bank could not be considered similar to "professional" and must be considered "such as" "a business" or "service". The zoning ordinance defined business offices:
19-20 Definitions and Interpretations

j. Business Office. A business establishment which does not offer a product or merchandise for sale to the public but offers a service to the public. However, personal services, such as barber and beauty shops and repair services, such as radio and television repair shops, shall not be included within the definition of business services.
Nothing in the ordinance defined "professional." Banks, however, were specifically listed in the design criteria section of the site plan review ordinance, along with financial, business and professional offices.
19A-3a(18) Minimum Required Off-Street Parking Space

* * * * * * * *

*568 j. Banks, financial and business offices and professional offices [require] one parking space for every 400 square feet of gross floor area of the building or major fraction thereof.
Thus, in their site plan review ordinance the municipal legislators had taken for granted that banks were permitted in Freehold. More important, they accepted a common relationship among buildings permitted as banks, financial and business and professional offices respecting a required parking/floor-area ratio. In so doing, it was clear that the municipal legislators viewed as similar the desirable appearance, as well as probable density of use, common to such buildings and uses. These are all zoning decisions. N.J.S.A. 40:55D-2 and -4; N.J.S.A. 40:55d-70d.
The aim of courts in construing ordinances, like statutes, is to determine legislative intent. Ordinances should be liberally construed in favor of the municipality. L & L Clinics, Inc. v. Town of Irvington, 189 N.J. Super. 332, 460 A.2d 152 (App.Div. 1983), certif. denied 94 N.J. 540, 468 A.2d 191 (1983). Where the construction of an ordinance is aided by references within it to the express intent of the governing body, "[i]t is this legislative directive which must govern...." Terner v. Spyco, Inc., 226 N.J. Super. 532, 539, 545 A.2d 192 (App.Div. 1988). When confronted with ordinance provisions which are arguably inconsistent, it is the court's obligation "to read them so as to make sense of them, and then to apply the ordinance in accordance with the intent of the municipality." Rowatti v. Gonchar, 101 N.J. 46, 56, 500 A.2d 381 (1985).
Trust Company relies on Grancagnola v. Planning Bd, 221 N.J. Super. 71, 75, 533 A.2d 982 (App.Div. 1987), for the proposition that an interpretation of an ordinance by a planning board is entitled to no weight. At issue here, however, is not agency interpretation, See N.J.S.A. 40:55D-70(b), but interpretation by the municipal governing body in the preamble to its 1986 *569 ordinance.[8] Moreover, this was not a single interpretation of the zoning ordinance. Banks had been accepted as a permitted "professional" or similar use in B-1 for some time. In a similar context, the Supreme Court has said that the long-standing interpretation of an agency "will generally be granted great weight as evidence of its conformity with the legislative intent." Last Chance Development Partnership v. Kean, 119 N.J. 425, 435, 575 A.2d 427 (1990). We find Trust Company's challenges insufficient, when measured by the standards of Riggs II, to overcome the presumptive validity of the 1986 ordinance. The ordinance followed a generally accepted interpretation in the borough and accorded with the Plan. The courts may not second guess the municipal legislature absent compelling reasons.
Separately, plaintiff attacks defendant's site plan approval, asserting that the bank was a prohibited use because it would generate too much traffic, prohibited by the ordinance. In this respect, Colonial State's reliance on PRB supra, 105 N.J. at 6, 518 A.2d 1099, is justified. Nothing in the record suggests a principled way in which one might apply the ordinance to distinguish between a permitted and a non-permitted use on the basis of the traffic it encouraged. Respecting parking, we have cited the parking space ordinance and its specific reference to banks. Plaintiff conceded that the number of parking spaces required under the ordinance were provided by the site plan. Trust Company's reliance on the B-1 requirement of no more than a six car garage on a B-1 lot is misplaced.
Respecting the validity of the incidental variances, we agree with the prerogative writs judge that Trust Company's procedural and evidential challenges are meritless. It is axiomatic *570 that where a statute gives a local board the discretion to grant certain relief, a court may intervene only upon a showing that the board's decision was arbitrary, unreasonable or capricious. Kramer v. Bd. of Adjust., Sea Girt, 45 N.J. 268, 296, 212 A.2d 153 (1965). A board's resolution of factual issues must stand if supported by sufficient credible evidence in the record. Rowatti v. Gonchar, 101 N.J. at 51, 500 A.2d 381. In Kaufmann v. Planning Bd. for Warren Tp., 110 N.J. 551, 559, 542 A.2d 457 (1988), the Court analyzed the N.J.S.A. 40:55D-70c(2) (flexible c) variance criteria. The Court said, the variance must benefit the community by representing a better zoning alternative. In granting such a variance, planning boards were admonished to focus on the characteristics of the land presenting an opportunity for improved zoning and planning. Id. at 563, 542 A.2d 457. Moreover, boards were told to seek to effectuate the goals of the community as expressed through its zoning and planning ordinances. Id. at 564, 542 A.2d 457.
Trust Company's reliance on Wawa Food Market v. Planning Bd., 227 N.J. Super. 29, 545 A.2d 786 (App.Div. 1988), is misplaced. We there held that the presence of a parking-space-number and driveway-width requirement in the zoning (rather than in the site plan review) ordinance meant that the requirement was not one of design which could be waived under N.J.S.A. 40:55D-51b, but the matter was returned to the planning board to consider a c(2) variance. Id. at 39, 545 A.2d 786.
We conclude that there was sufficient evidence before the Board to justify its conclusion that incidental variances were appropriate under N.J.S.A. 40:55D-70c(2). In its resolution the Board made the requisite findings, that the site plan was not at variance with the borough's environmental concerns, and that it was consistent with the neighborhood and municipal scheme, which conformed to the policy as outlined by the Master Plan.
Affirmed.
NOTES
[1] Colonial State proposed the construction of a bank which was not a branch but a central headquarters, unlike other banks referred to in the record.
[2] In 1988 the southwest corner contained a veterinary hospital and the southeast corner a dentist office. North of the premises was a real estate office and dental office.
[3] Neither Mr. Higgins nor Mr. Winters voted at any Board consideration of the site plan approval application. Before the prerogative writs judge, Trust Company counsel appeared to concede that, at Board hearings, disqualified members would leave the room.
[4] The Court also noted that zoning ordinances often contain "certain generic terms" with "commonly-accepted" meanings. One such term cited was "professional." The Court said, "We express no criticism of the use of such terms in zoning ordinances, whether defined or not, where their meaning is generally understood." Id. 105 N.J. at 7 n. 3, 518 A.2d 1099.
[5] Another valid municipal purpose is to make variances unnecessary through appropriate planning ordinances. We have already observed that some banking offices in Freehold had been created or expanded by variance, followed by a zoning change. See Medici v. BPR Co., 107 N.J. 1, 20, 526 A.2d 109 (1987).
[6] Although the term "central business district" was not used in the zoning code, Trust Company's planner equated the Master Plan terminology "central business district" with the B-2 zoning.
[7] We select "barber shops" only by way of illustration of a use common to the relevant ordinances.
[8] Grancagnola is distinguishable on other grounds as well. There we relied upon the fact that the use at issue, "retail stores", was specifically permitted in some zones. We found that specificity to be evidence that they were not intended to be permitted as a general "commercial use." 221 N.J. Super. at 77, 533 A.2d 982.