897 A.2d 1094 (2006)
385 N.J. Super. 501
Gerald G. HAGGERTY and Mary Jane Haggerty, Kathy Lou Colmorgen, Kaye Ernst, Jeffrey M. Weiner, Rudy Vener and Gina Vener, and David Prown, Plaintiffs-Appellants,
v.
RED BANK BOROUGH ZONING BOARD OF ADJUSTMENT, Defendant-Respondent, and
Building & Land Technology, a/k/a Building & Land Technology Inc., Defendant, and
Palatial Homes at Red Bank, L.L.C., Defendant/Intervenor-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued March 29, 2006.
Decided May 22, 2006.
*1095 William E. Meyer, Red Bank, argued the cause for appellants.
Kevin E. Kennedy argued the cause for respondent Red Bank Borough Zoning Board of Adjustment.
Stephen E. Barcan, Woodbridge, argued the cause for respondent Palatial Homes at Red Bank (Wilentz, Goldman & Spitzer, attorneys; Mr. Barcan, of counsel and on the brief; Jessica S. Pyatt, on the brief).
Before Judges CONLEY, WEISSBARD and SAPP-PETERSON.
The opinion of the court was delivered by
WEISSBARD, J.A.D.
Plaintiffs, landowners in the Borough of Red Bank (Borough), appeal from the dismissal of their complaint in lieu of prerogative writs challenging decisions of defendant, Red Bank Borough Zoning Board of Adjustment (Board), granting the bifurcated application of Building and Land Technology (BLT) for a "d" /density variance, and thereafter for bulk variances and site plan approval to construct condominiums and townhouses. Because of an impermissible conflict of interest on the part of the Board's presiding officer, we reverse and remand for new hearings.
BLT was the contract purchaser of real property located along Monmouth, West, and Oakland Streets in the Borough, also known as Block 42, lots 1, 2, 2.01, 3, 4, 19, and 20 (the property). Lots 1, 2, 2.01, 3, and 4 are located in the Borough's Business/Residential (BR)-1 zone; lots 19 and 20 are located in the BR-2 zone. The combined lot area is 52,511 square feet, including 39,250 square feet in the BR-1 zone and 13,261 square feet in the BR-2 zone. A variety of residential and commercial uses surround the project site including, but not limited to, the Red Bank Train Station.
On July 18, 2002, Patrick Nulle, on behalf of BLT, submitted a development application for a proposed project of two condominium buildings of sixteen units, with each unit consisting of 1680 square feet, to be constructed on lots 1, 2, 2.01, 3, and 4. The application indicated that the proposed condominiums would replace an existing gas station/car wash on the property. The application included a sworn statement dated July 16, 2002, from Frank M. Torra stating that he owned lots 1, 2, and 2.01 and that he approved and agreed to the application, and a sworn statement dated July 17, 2002, from Maureen Grimaldi stating the same as to lots 3 and 4.
On July 29, 2002, the Director of Planning and Zoning denied the development permit, noting that the applicant needed to go before the Zoning Board for a "d" /density use variance and site plan approval.
On October 25, 2002, Torra signed another statement confirming that he owned lots 19 and 20, and approved and agreed to the development application. Apparently around the same time, Nulle submitted an *1096 undated disclosure-of-ownership form stating that he was a sole proprietorship, that he held a 100% ownership interest in connection with the application, and that he resided at 138 Bodman Place in the Borough. BLT's name did not appear on the form.
BLT subsequently reapplied to the Zoning Board for a density variance, bulk variances, and site plan approval associated with a request to construct a thirty-unit condominium complex and a five-unit townhouse development. BLT elected to bifurcate its application and, therefore, first sought to obtain the density variance.
On December 5, 2002, defendant-intervenor, Palatial Homes at Red Bank, L.L.C. (Palatial) entered into an agreement with Nulle under which BLT agreed to assign to Palatial its right to purchase the property contingent on BLT's obtaining the necessary land-use approvals for construction of thirty-five residential units.

I

A. The Density Variance

The Zoning Board held public hearings on BLT's application for a density variance, N.J.S.A. 40:55D-70d, on December 19, 2002, January 16, 2003, and February 6, 2003. Although BLT did not seek site plan approval at that point, it submitted preliminary and final site plans dated September 30, 2002 to the Board. Approximately eight individuals at the hearings expressed opposition to the application, including plaintiffs Gerald Haggerty and Kathy Colmorgen. BLT presented five witnesses: Marta Pierson Villa, a revitalization consultant; Anthony Ercolino, a licensed architect; Thomas Santry, a licensed land surveyor; Nicholas Verderese, a traffic engineer; and Andrew Janiw, a professional planner.
At the first hearing, Board Chairman Michael DuPont recused himself, stating that he did so to avoid an appearance of conflict because he or his partner at the law firm of McKenna, DuPont, Higgins & Byrnes (McKenna DuPont) represented "one or both" of the applicants "a number of years ago." DuPont did not elaborate further. As a result of DuPont's recusal, Vice-Chairperson Lauren Nicosia, whose father, retired Judge Benedict R. Nicosia, served in an "of counsel" capacity at the same law firm, served as acting chairperson with regard to BLT's application.
Because of the grounds on which we decide this appeal, we have no need to detail the evidence presented at the several hearings. At its hearing on February 6, 2003, the Board conditionally approved BLT's application for a density variance.
On March 20, 2003, the Board adopted, by a six-to-one vote, a sixteen-page resolution memorializing its conditional approval of the density variance for a thirty-unit condominium complex and a five-unit townhome development. Among other things, the Board found that the proposed development was an appropriate use for the site, was consistent with the Borough's master plan, and was compatible with the surrounding area. The Board expressly conditioned its approval upon BLT's obtaining appropriate site plan and bulk variance approvals, and all necessary approvals from outside agencies. No appeal was filed challenging the Zoning Board's density approval.

B. Site Plan Approval and Bulk Variances

Subsequently, BLT submitted its application to the Board for approval of its site plan and bulk variances. N.J.S.A. 40:55D-70c.[1]
*1097 BLT sought bulk variances for minimum lot area, front and side-yard setbacks, buffer areas, and parking as well as design waivers. Chairman DuPont again recused himself, stating that he formerly represented the owner of the gas station on the property in some of his business dealings. On December 11, 2003, the Board approved the application as submitted, finding that the project would have no detrimental effect on local property values or the health and welfare of the community.
On January 22, 2004, the Board adopted a thirty-seven-page resolution granting the application as presented and modified for site plan approval and bulk variances subject to certain enumerated conditions and the applicant's compliance with all other appropriate rules, regulations, and ordinances. The modified application called for the construction of a five-unit townhouse development consisting of one building (Phase I) and twenty-nine upscale residential units including a twenty-four-unit condominium complex consisting of two buildings (Phase II). As such, the proposed development had a lower density than that approved during the first portion of the bifurcated application hearing. BLT's application also sought to consolidate Block 42, lots 19 and 20 so as to create a proposed lot 19.01 which would contain the townhouses, and to consolidate Block 42, lots 1, 2, 2.01, 3 and 4 so as to create a proposed lot 1.01 which would contain the condominiums.
The resolution contained sixty-six findings of fact. In particular, the Board found that the application satisfied the statutory requirements of N.J.S.A. 40:55D-70c(bulk variances) and, in conjunction with noted conditions and requested design waivers, satisfied the site plan requirements of the Borough's land development ordinance. The Board also found that the project would further the objectives of the master plan to encourage growth and development near the train station and in the Monmouth Street vicinity without adverse impacts on traffic, the environment or surrounding uses.
The Board further found: that it had proper jurisdiction to hear the matter; that condominiums and townhouses were permitted in the subject zones except for the proposed densities, and were appropriate uses; that the upscale and well-designed residential complex would appropriately complement the adjoining residential uses and not substantially impair the character of the existing area; that, subject to conditions, the bulk variances and design waivers could be granted without causing substantial detriment to the public good; that the application's benefits outweighed any of its detriments); and that approval of the application would promote various purposes of the MLUL, such as promoting "a desirable visual environment through creative development techniques."

II
On March 8, 2004, plaintiffs Gerald G. Haggerty, Mary Jane Haggerty, Kathy Lou Colmorgen, Kaye Ernst, Jeffrey M. Weiner, Rudy Vener, Gina Vener, and David Prown[2] filed a complaint in lieu of prerogative writs against the Board and BLT, challenging the Board's decision to grant site plan and variance approvals for BLT's development application. On April 5, 2004, the Board filed an answer, and on May 4, 2004, BLT filed an answer with a *1098 counterclaim for damages. The counterclaim apparently was dismissed on a subsequent motion by BLT.
On October 7, 2004, Palatial moved to intervene as owner of the property. On June 22, 2004, Palatial had purchased Block 42, lots 1, 2, 2.01, 19 and 20 pursuant to its December 5, 2002, agreement with BLT. On August 30, 2004, Palatial purchased lots 3 and 4. On October 20, 2004, the trial judge issued an order granting Palatial leave to intervene as a defendant.
On January 7, 2005, the judge denied plaintiffs' motion to expand the record and permit discovery on alleged conflicts of interest, finding that the motion was filed out of time. Specifically, the judge noted that plaintiffs filed the motion on December 22, 2004, more than three weeks after they submitted their trial brief, and that its return date of January 7, 2005, was only four days prior to the scheduled trial. Moreover, the trial court noted that it had denied plaintiffs' initial request to expand the record on their conflicts-of-interest allegations, finding that they were too speculative, and on October 20, 2004, had advised plaintiffs that any further request must be made by formal motion. Instead, plaintiffs filed their trial brief, which violated the court's pretrial order by impermissibly relying on evidence outside of the record below. As the trial judge explained:
It appears that [plaintiffs' attorney] is now seeking retroactively to cure this defect by filing the within notice of motion to expand the record below to include such extensive evidence.
....
Based on the foregoing facts, the Court finds that it would be inappropriate to entertain such a motion. [Plaintiff's attorney] should not be permitted to ignore this Court's specific instructions and adopt his own procedure for expanding the record by unilaterally introducing extensive evidence in a trial brief and then seeking to justify its attachment with an untimely notice of motion.
[Plaintiff's attorney] had ample time to file a proper motion to expand the record, but simply failed to do so.
At the bench trial on January 12, 2004, among plaintiffs' arguments were that: (1) BLT was a non-existent and false entity; (2) Alexis Nulle (Patrick's wife) and Palatial had undisclosed ownership interests in BLT; (3) Board members Nicosia and Murphy had conflicts of interest that required their recusal, and member Irving was too one-sided and unfair in his questions during the hearings; and (4) the Board improperly permitted BLT to bifurcate its application and approved the density variance without the requisite votes.
In a twenty-four-page opinion, filed February 24, 2005, the judge affirmed the Board's decision to approve the site plan and variances, finding that: (1) there was no adequate basis to extend the time limitations under R. 4:69-6 to challenge the Board's approval of BLT's application for a density variance or to challenge the bifurcation of BLT's application; (2) in any event, the Board did not act arbitrarily, capriciously, and unreasonably in permitting the bifurcation; (3) the Board's four-to-two vote in favor of the site plan and bulk variances was sufficient to approve the application; and (4) there was insufficient evidence as a matter of law to establish that any Board members or the Board's attorney, had disqualifying conflicts of interest. An order dismissing the complaint with prejudice was entered on March 11, 2004.
On appeal plaintiffs argue as follows:
POINT I
THE DENSITY "d" VARIANCES APPROVAL CONSTITUTED AN IMPROPER USURPATION OF THE *1099 ZONING POWER RESIDING IN THE MUNICIPALITY.
POINT II
THE APPLICANT BLT DID NOT EXIST, IT WAS A DEVICE SOLELY TO PERPETRATE A FRAUD, HAVING NO STATUS AS A DEVELOPER OR APPLICANT, AND THE APPROVALS GRANTED TO THIS NON-EXISTENT NAME WITHOUT STATUS ARE VOID.
POINT III
THE PROCESS WAS PERMEATED WITH UNDISCLOSED AND SUBSTANTIAL DISQUALIFYING CONFLICTS OF INTEREST.
PALATIAL HOMES/BOARD CHAIR NICOSA [sic]
NULLE-PALATIAL/BOARD MEMBER MARIE MURPHY
POINT IV
THE APPEAL ON ALL ISSUES IS TIMELY.
We agree that there was a disqualifying conflict of interest on the part of Board Vice-Chairperson Nicosia which called for her recusal. As a result of her participation in both portions of the bifurcated hearing, the entire process was tainted and must be set aside. As a result of our disposition, we have no need to address Points I and II. We deal briefly with Point IV.

III
The trial judge held that plaintiffs' complaint challenging the density variance was untimely because it was not filed within forty-five days after publication of the notice of the Board's first resolution on March 20, 2003. R. 4:69-6(a). The judge explained:
Here, the Board adopted its memorializing resolution granting BLT's "d" variance on March 20, 2004[sic]. Moreover, BLT published notice of the resolution on March 31, 2003. Thus, pursuant to R. 4:69-6(b)(3), plaintiffs were obligated to file their appeal by May 15, 2003. Plaintiffs, however, did not file their complaint until March 8, 2004, almost one year after notice of the Board's resolution was published. Clearly, such an untimely challenge must be dismissed pursuant to R. 4:69-6. Plaintiffs should not be permitted to slumber on their rights, especially when an applicant has in good faith relied on their statutory right to bifurcate an application.
On appeal plaintiffs argue that the density variance proceeding and the subsequent site plan and bulk variance proceedings were so interrelated that their complaint must be deemed timely since it was filed within forty-five days of the second resolution. Although there are substantial arguments on both sides of this question, our determination concerning the disqualification issue makes it unnecessary to decide the important question thus posed. Since there must be a new hearing, we have no reason to address plaintiff's attack on the Board's decision (Point I) which the trial judge found was barred due to non-compliance with the time limits of R. 4:69-6(a).
Although the judge did not find that plaintiffs' disqualification argument was similarly time-barred, at least with respect to the first density variance hearing, and while defendants do not make that specific claim on appeal, it warrants our consideration. We conclude that the issue of a disqualifying conflict goes to the fundamental integrity of the proceedings and may be raised on appeal even though, as in this case, no separate appeal was filed at the conclusion of the first half of the bifurcated hearing process. Thus, a timely appeal at the conclusion of the entire process may raise a disqualification issue that affects the first part as well as the second. Clearly, the "interest of justice" compels such a conclusion. R. 4:69-6(c). Accordingly, *1100 we turn to plaintiffs' disqualification argument.

IV
As noted, at the outset of the first hearing on the density variance, Board Chairman DuPont recused himself, stating: "I will not be able to sit on this Board this evening, as I have or my partner has represented one of the or both of the applicants previously a number of years ago. So in deference to caution and also in the appearance of conflict, I'm stepping down. So Ms. Nicosia can fill the role here." DuPont did not provide further details and no one present inquired further. As a result, the Board's Vice-Chairperson, Lauren Nicosia, served as acting chairperson with respect to both parts of BLT's application. Nicosia's father, retired Superior Court Judge Benedict R. Nicosia, was at the time "of counsel" to the McKenna DuPont firm.
At trial and again on appeal, plaintiffs argue that Lauren Nicosia was disqualified from participating in the proceedings. The trial judge found the allegations concerning Nicosia "too remote and speculative to warrant disqualification." He explained:
Ms. Nicosia's father, retired Judge Benedict Nicosia, simply serves in an "of counsel" capacity to the McKenna DuPont law firm. As such, the Court finds that Ms. Nicosia does not have an "indirect pecuniary interest" in BLT's application, as there is no evidence indicating that Judge Nicosia would financially benefit from the approval of BLT's application. Wyzykowski [v. Rizas, 132 N.J. 509, 525-26, 626 A.2d 406 (1993)]. Furthermore, there is no proof to substantiate any allegation that BLT's application would benefit Ms. Nicosia in a non-financial way, such as "in the case of councilman's mother being in a nursing home subject to the zoning issue." Ibid. Likewise, the Court rejects any assertion that Judge Nicosia's "of counsel" relationship with the McKenna DuPont law firm creates an "indirect personal interest" for Ms. Nicosia. Ibid.

Overall, the Court finds that the circumstances of this case cannot be "reasonably interpreted to show that they had the likely capacity to tempt [Ms. Nicosia] to depart from [her] sworn public duty." Van Itallie [v. Borough of Franklin Lakes, 28 N.J. 258, 268, 146 A.2d 111 (1958)]. There was simply no incentive for Ms. Nicosia to compromise her duty as a municipal officer. In the end, plaintiffs' allegation that Ms. Nicosia should be disqualified because her father serves in an "of counsel" capacity to a law firm that once represented the contract purchaser of the subject property is precisely the type of suggestion of "a remote and nebulous interest" that the New Jersey Supreme Court previously warned against. See Wyzykowski, supra, 132 N.J. at 524, 626 A.2d 406.
We disagree.
The governing principles are well known. Under the common law, the public is entitled to have its representatives perform their duties free from any personal or pecuniary interests that might affect their judgment. Wyzykowski v. Rizas, 132 N.J. 509, 522-23, 626 A.2d 406 (1993); Barrett v. Union Twp. Comm., 230 N.J.Super. 195, 200, 553 A.2d 62 (App.Div. 1989). "This is essential if the public is to have confidence and trust in the representatives who are required to decide public issues coming before them." Barrett, supra, 230 N.J.Super. at 200, 553 A.2d 62. The question is whether there is a potential for conflict, not whether the conflicting interest actually influenced the action. Wyzykowski, supra, 132 N.J. at 523, 626 A.2d 406; Griggs v. Borough of Princeton, 33 N.J. 207, 219, 162 A.2d 862 (1960); Care of Tenafly, Inc. v. Tenafly Zoning Bd. of Adj., 307 N.J.Super. 362, 370, 704 A.2d *1101 1032 (App.Div.), certif. denied, 154 N.J. 609, 713 A.2d 500 (1998).
Thus, "[a] conflict of interest arises when the public official has an interest not shared in common with the other members of the public." Wyzykowski, supra, 132 N.J. at 524, 626 A.2d 406; see also Barrett, supra, 230 N.J.Super. at 204, 553 A.2d 62 (holding councilman had disqualifying conflictnot held by members of the publicwhere his mother resided in nursing home favored by zoning amendment). All interests, however, do not possess the same capacity to tempt the public official to depart from his or her sworn duty. Barrett, supra, 230 N.J.Super. at 201, 553 A.2d 62. "A remote and speculative interest will not be held to disqualify the official." Ibid. (citing Van Itallie v. Borough of Franklin Lakes, 28 N.J. 258, 269, 146 A.2d 111 (1958)).
In Wyzykowski, the Court identified four situations that require disqualification:
(1) "Direct pecuniary interests," when an official votes on a matter benefiting the official's own property or affording a direct financial gain; (2) "Indirect pecuniary interests," when an official votes on a matter that financially benefits one closely tied to the official, such as an employer, or family member; (3) "Direct personal interest," when an official votes on a matter that benefits a blood relative or close friend in a non-financial way, but a matter of great importance, as in the case of a councilman's mother being in the nursing home subject to the zoning issue; and (4) "Indirect Personal Interest," when an official votes on a matter in which an individual's judgment may be affected because of membership in some organization and a desire to help that organization further its policies.
[Wyzykowski, supra, 132 N.J. at 525-26, 626 A.2d 406 (citing Michael A. Pane, Conflict of Interest: Sometimes a Confusing Maze, Part II, New Jersey Municipalities, March 1980, at 8, 9).]
Where a board member has an immediate and real conflict, it must be disclosed. See McVoy v. Bd. of Adj. of Twp. of Montclair, 213 N.J.Super. 109, 113, 516 A.2d 634 (App.Div.1986) (stating that, "disclosure is necessary to be able to judge `whether a particular interest is sufficient to disqualify' or is too `remote and speculative'"); Marlboro Manor, Inc. v. Bd. of Comm'rs of Twp. of Montclair, 187 N.J.Super. 359, 362-63, 454 A.2d 905 (App.Div.1982) (nullifying proceedings where two council members failed to disclose that they belonged to the church whose pastor appeared at a hearing to speak against the application for a liquor license). Thus, conflicts-of-interest issues are fact sensitive and depend upon the circumstances of the particular case. See Paruszewski v. Twp. of Elsinboro, 154 N.J. 45, 58-60, 711 A.2d 273 (1998) (holding appearance of township attorney before zoning board did not create potential conflict where he advocated position not for his own private interest, but for the public's interest); Wyzykowski, supra, 132 N.J. at 526, 626 A.2d 406 (holding building official appointed to salaried positions by mayor had disqualifying interest in outcome of mayor's application).
The Local Government Ethics Law, N.J.S.A. 40A:9-22.1 to -22.5 (Ethics Law), also governs conflicts of interest. That statute provides in pertinent part:
No local government officer or employee shall act in his official capacity in any matter where he, a member of his immediate family, or a business organization in which he has an interest, has a direct or indirect financial or personal involvement that might reasonably be expected to impair his objectivity or independence of judgment.
[N.J.S.A. 40A:9-22.5d.]
*1102 The Ethics Law defines "local government officer" as any person "serving on a local government agency which has the authority to enact ordinances, approve development applications or grant zoning variances," N.J.S.A. 40A:9-22.3g(2), and a "local government agency" as a municipal board which performs functions in other than a purely advisory nature. N.J.S.A. 40A:9-22.3e.
The MLUL also expressly prohibits a zoning board member from acting "on any matter in which [the member] has, either directly or indirectly, any personal or financial interest." N.J.S.A. 40:55D-69. The same prohibition applies to planning board members. N.J.S.A. 40:55D-23b. See Trust Co. of N.J. v. Planning Bd. of Borough of Freehold, 244 N.J.Super. 553, 559-60, 582 A.2d 1295 (App.Div.1990) (holding, among other things, that N.J.S.A. 40:44D-23b prohibited board members who were an associate and partner in law firm that represented the bank seeking site plan approval from voting for ordinance declaring that banks were permitted in B-1 zone).
At the time of his voluntary recusal, DuPont stated that he or his partner had represented "one or both of the applicants" some years earlier. DuPont did not say which of his partners was being referred to nor did he provide any further details. Since BLT was the applicant and Nulle signed the application on behalf of the corporation as to which he asserted a 100% ownership interest, we assume that DuPont was referring to Nulle or BLT.[3]
However, at the time of trial in the Law Division, the judge was presented with additional information respecting DuPont's law firm.[4] In May 2002, Palatial had filed a development permit with the Borough of Little Silver seeking approval for a major subdivision. The application was signed by Edward J. McKenna Jr. as attorney for Palatial. McKenna is a named partner in the McKenna DuPont law firm. Thereafter, McKenna represented Palatial before the Little Silver Planning Board, representation that continued until at least January 2004. As we have noted, on December 5, 2002, shortly before the hearings in this matter commenced, BLT agreed to assign its right to purchase the properties on Monmouth Street to Palatial, contingent on BLT obtaining all the required land use approvals to construct the condominiums. Thus, throughout the proceedings before the Board, Palatial, who had a clear and distinct interest in the Red Bank proceedings, was being represented by DuPont's firm. While we do not address whether Palatial's interest should have been disclosed to the Board, since it was not the "applicant," N.J.S.A. 40:55D-3, it provided an additional reason why DuPont's recusal was appropriate.[5]
The question before us is, then, whether Lauren Nicosia had a disqualifying conflict arising from her father's "of counsel" relationship with the McKenna firm. We conclude that her disqualification was required.
While no prior decision has addressed the "of counsel" relationship in *1103 this context, see Staron v. Weinstein, 305 N.J.Super. 236, 240-43, 701 A.2d 1325 (App.Div.1997) (discussing "of counsel" in the context of attorney malpractice), we are satisfied that a person in an "of counsel" relationship with a law firm has a sufficient stake in the financial viability of the firm as to impute to such individual any disqualification of the firm arising from client representation by partners or associates in the firm. See Restatement of the Law (Third), Restatement of the Law Governing Lawyers, § 123, cmt. c(ii) (2000) (ordinarily imputing attorney conflicts of interest to "of counsel" attorneys in the law firm). Indeed, in order to properly use the designation "of counsel," there must be a close, ongoing relationship with the firm. Ibid.; see also Michels, New Jersey Attorney Ethics, § 5:6 at 60-62, § 7:2-8 at 98-99, § 36:4-2c at 795-96 (Gann 2005). Without doubt, Judge Nicosia was a "member of [Lauren Nicosia's] immediate family," N.J.S.A. 40A:9-22.5d, a "family member," Wyzykowski, supra, 132 N.J. at 525, 626 A.2d 406. It does not matter, as defendants have urged, that Ms. Nicosia is an adult living her life independent of her family. Her independent status does not sever her family ties and thereby eliminate the conflict. Contrary to the trial judge's view, the conflict was neither "remote" nor "speculative." We consider the appearance of impropriety inherent in this relationship to be "something more than a fanciful possibility." Petrick v. Planning Bd. of Jersey City, 287 N.J.Super. 325, 331, 671 A.2d 140 (App. Div.1996) (quoting Aronowitz v. Planning Bd. of Lakewood, 257 N.J.Super. 347, 352, 608 A.2d 451 (Law Div.1992)). Nor would it matter that Ms. Nicosia was not aware of the conflict; it is the potential for conflict that requires disqualification. Id. at 524, 608 A.2d 451; Gunthner v. Planning Bd. of the Borough of Bay Head, 335 N.J.Super. 452, 460-61, 762 A.2d 710 (Law Div.2000). Here, of course, Ms. Nicosia was on actual notice of the conflict as a result of DuPont's recusal. Nicosia was, therefore, disqualified from participating in these proceedings.
As a result of Nicosia's participation, the Board proceedings, in their entirety, are void and must be set aside. Aldom v. Borough of Roseland, 42 N.J.Super. 495, 501, 127 A.2d 190 (App.Div.1956). It will not suffice to simply void Nicosia's vote.[6] "The fact that the measure had sufficient affirmative votes to pass without [her] participation does not save it from being voided." Id. at 507, 127 A.2d 190 (citing Pyatt v. Mayor and Council of Dunellen, 9 N.J. 548, 557, 89 A.2d 1 (1952)); see also Griggs v. Princeton Borough, 33 N.J. 207, 220, 162 A.2d 862 (1960); Szoke v. Zoning Bd. of Adj. of Monmouth Beach, 260 N.J.Super. 341, 345, 616 A.2d 942 (App.Div.1992); Trust Co. of N.J., supra, 244 N.J.Super. at 559-60, 582 A.2d 1295; Barrett, supra, 230 N.J.Super. at 202-03, 553 A.2d 62; Cox, supra, § 3-2 at 55-56.
As a result of our conclusion concerning Nicosia, we have no need to address plaintiffs' arguments respecting Board member Murphy. Regrettably, Nicosia's ill-advised participation in these proceedings necessitates setting them aside and remanding to the Board for entirely new hearings.[7]
Reversed.
NOTES
[1] The Board of Adjustment has power to deal with the site plan review where it is ancillary to an application for a "d" variance. N.J.S.A. 40:55D-60; William M. Cox, New Jersey Zoning and Land Use Administration, § 15-7 at 356 (Gann 2006).
[2] According to counsel for Palatial, the Haggerty plaintiffs subsequently sold their property in the Borough and moved to Florida. In addition, plaintiffs' counsel has advised, without explanation, that David Prown should be removed as a plaintiff.
[3] In its brief, Palatial states that: "Plaintiffs do not allege that Mr. DuPont's law firm represented the applicant BLT." However, at the time DuPont made his statement, there is no evidence plaintiffs would have thought that he meant anything but Nulle or BLT. If he meant something else, he should have said so.
[4] The trial judge permitted plaintiffs to expand the record to include documents that were attached to plaintiffs' motion to "Expand the Record/Allow Discovery." The judge denied plaintiffs' request for additional discovery.
[5] Indeed, by the time of the Law Division proceedings, Palatial had, pursuant to its agreement with BLT, become sole owner of the properties in question, having closed title on June 22 and August 30, 2004.
[6] It appears that without Nicosia's vote there still would have been the necessary five votes needed for approval. N.J.S.A. 40:55D-70d.
[7] We were advised at oral argument that the composition of the Board has changed since the original hearings under review.