**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1563-20

RARITAN PARTNERS, LLC,

     Plaintiff-Appellant,

v.

RARITAN TOWNSHIP
BOARD OF ADJUSTMENT,[1]

     Defendant-Respondent.

_____

          Argued January 18, 2022 – Decided February 7, 2022

          Before Judges Vernoia and Firko.

          On appeal from the Superior Court of New Jersey, Law Division, Hunterdon County, Docket No. L-0021-20.

          Timothy M. Prime argued the cause for appellant (Prime & Tuvel, LLC, attorneys; Timothy M. Prime, on the briefs).

          Jonathan E. Drill argued the cause for respondent (Stickel, Koenig, Sullivan & Drill, LLC, attorneys; Jonathan E. Drill, of counsel and on the brief; Kathryn J. Razin, on the brief).

---

[1] Improperly pled as Township of Raritan Zoning Board/Board of Adjustment.

PER CURIAM

In this action in lieu of prerogative writs matter, plaintiff Raritan Partners, LLC appeals from the January 14, 2021 Law Division order dismissing its complaint with prejudice and affirming defendant Raritan Township Zoning Board of Adjustment's (Board) denial of its application for four variances and site plan approval to construct a Wawa convenience store with a gasoline fueling station. For the following reasons, we affirm.

I.

The following facts are derived from the record. Plaintiff was the contract purchaser of a tract of property located in the Township of Raritan's (Township) B-2 zone, a commercial zone, intended "to define and provide controls for the major shopping and business areas of the Township, serving the needs of both Township residents and the regional population, and transient highway users." The site consists of two-and-a-half acres having two lots, which are triangular in shape, with one side facing a municipal street, New Castle Way, and the other side facing State Highway 31 (Route 31). The property contained a two-story commercial building, a parking lot, a residential dwelling, a channel, and a "barn."

2

In 2018, plaintiff filed an initial application with the Board for a conditional use variance and preliminary and final site plan approval to demolish the improvements and develop the site with: (1) a 5,585 square foot Wawa store; (2) a Wawa fueling station with six gasoline pumps, twelve filling dispensers, three employee kiosks, with a weather protection canopy over the fueling station and kiosks; (3) three underground gasoline storage tanks; (4) a parking lot; (5) enclosures for trash and recycling receptacles; (6) stormwater facilities for stormwater management; and (7) other related site improvements.

Ordinance section 296-114B (formerly known as 16.26B.020.A) provided a list of principal permitted uses.[2] In pertinent part, subsection B(1) of the ordinance listed "[r]etail and service uses, excluding those uses listed under Subsection D." Ordinance section 296-114D (formerly known as 16.26B.040.E) provided a list of conditional uses, including "[g]asoline filling stations and public and repair garages." The proposed Wawa convenience store was a principal permitted retail use in the B-2 zone pursuant to ordinance section 296-114B(1), and the Wawa fueling station was a conditional use in the B-2 zone pursuant to ordinance section 296-114D(5).

_____

[2] On November 18, 2020, the Township re-codified its code. This opinion references the prior code because the record before us indicates the Board's resolution referenced the prior code.

Plaintiff's initial application also sought two variances, specifically: (1) a "c(2) [n]on [u]se[-][v]ariance (flexible; benefits vs. detriment)"; and (2) "d(3) [d]eviation from a specification or standard pursuant to Section 54 of P.L. 1975, c. 291 (C.40:55D-67) pertaining solely to a conditional use."

At the hearing, plaintiff revised its application based on comments from the Board and, in its final application, plaintiff sought the following: (1) one d(1) variance from ordinance 16.26B.020.A to construct the Wawa convenience store, a permitted use, and a gas station, a conditional use pursuant to 16.26B.040.E (plaintiff "applied for this relief without prejudice to its position that this relief is not required and reserved its rights on this issue"); (2) five d(3) variances to allow the construction and operation of the gas station where the proposed gas station would deviate from certain conditional use standards; (3) nine c(1) and/or c(2) variances for various ordinance deviations; (4) eleven exceptions to allow for further deviations; (5) "[c]onditional use approval to allow [the] operation of the conditionally permitted gas station; and" (6) preliminary and final site approval. Plaintiff prepared a "Zoning Relief Table" outlining the various waivers and variances it sought with the corresponding ordinance sections and the proposed relief. The Board conducted the hearing over twelve non-sequential days.

4

A.    D(1) Variance

On the first day of the public hearing, October 4, 2018, the issue of whether a d(1) variance was required was introduced by objector U.S. Fuel. Objector Wellington Hills Subdivision Development raised the issue of whether a d(1) variance was required.  Individual residents of the Wellington Hills subdivision and an attorney appeared as objectors and were self-represented. After reviewing the briefs submitted by plaintiff and the objectors, the Board determined that a d(1) variance was required because the ordinance defined "principal use" as the proposed use's main purpose in the singular and not in the plural.  In addition, the Board found the subject ordinance did not allow multiple purposes or uses, and that the convenience store and gasoline station in the proposed development were each principal uses, and one was not an accessory to the other.

On November 1, 2018, plaintiff elicited testimony regarding the details of the application from Michael Redel, a real estate engineer for Wawa.  He stated 600 out of 800 Wawa convenience stores include a fueling station "similar in size and scale to what" was proposed in plaintiff's application.  This site location was selected according to Redel because it comported with Wawa's business model geared toward morning and evening commuter "rushes" on a major traffic

A-1563-20

corridor.  On cross-examination, Redel testified that Wawa would not consider reducing the size of the store or the fueling station.

Plaintiff's planning expert, Paul Phillips, testified that Wawa managed its store and fueling station "as one single operation," which was consistent with industry trends.  Phillips opined that a d(1) variance was not required because "to impose stricter standards for review, would be inconsistent with how the [o]rdinance has previously been interpreted and applied for this type of use." Alternatively, Phillips testified that plaintiff satisfied the positive criteria for a d(1) variance since the location of the proposed development would be on a State highway and at a signalized intersection with "pass-by" customers.  In addressing the negative criteria, Phillips testified "that the use will not cause substantial detriment to the public good."

Gary Dean was called by plaintiff as its traffic engineering expert.  Dean testified the Institute of Traffic Engineers's (ITE) recent publication, which "allows traffic engineers and planners th[e] ability to look at actual data from a given land use," such as a convenience store with a gas station, "to assist in calculating traffic for that use and how it would impact roadway conditions and intersections," included a new land use category "known as a super convenience

6

store with gas pumps."  He testified as to the traffic patterns concerning this site and New Jersey Department of Transportation regulations pertaining to the area.

B.    D(3) Variance

At the commencement of the hearing on December 6, 2018, plaintiff's counsel addressed the issue of whether d(3) conditional use variances were required.  Specifically, plaintiff's counsel queried

> whether "d(3)" conditional use variances are required in the Wawa application to allow bulk zoning regulation deviations and site plan ordinance requirement deviations under the Township conditional use ordinance at issue, and if so, how many "d(3)" conditional use variances are required in the Wawa application to allow deviations from the applicable zoning ordinance regulations and the applicable site plan ordinance requirements.

Plaintiff's position was that no d(3) conditional use variances were required.

Objector U.S. Fuel's position was

> that each and every deviation from each and every bulk zoning regulation and each and every site plan ordinance requirement requires a separate "d(3)" conditional use variance so that [plaintiff] requires the same number of "d(3)" variances as it requires for each "c" bulk variance deviation and each site plan ordinance exception deviation.

The Board rejected both plaintiff's argument that no d(3) variances were required and U.S Fuel's argument that plaintiff required the same number of d(3)

variances as it did for each "c" bulk variance. The Board held that plaintiff required

> one "d(3)" conditional use variance for the failure to satisfy conditional use ordinance section 16.68.050.A (requiring gasoline stations to satisfy all bulk zoning ordinance regulations) and one "d(3)" conditional use variance for the failure to satisfy conditional use ordinance section 16.68.050.B (requiring gasoline service stations to satisfy all site plan ordinance requirements).

During the course of the public hearings, the Board required that plaintiff apply for five d(3) variances based on Board comments from ordinance sections 16.68.050.A, B, C, D, and E in order to build the proposed gas station where it would otherwise deviate from certain general conditional use requirements. Phillips opined that plaintiff did not need to apply for d(3) variances, but he addressed them with the understanding the Board had ruled otherwise. He testified plaintiff could "prove that the site can accommodate any problems associated with the proposed development and use, recognizing that it does not comply with all of the conditions that the [o]rdinance established to have that use."

Plaintiff sought approval to deviate from the following requirements under ordinance section 16.68.050.A: (1) the minimum front-yard setback of seventy-five feet needed to accommodate the fueling station canopy,

8

convenience store, and trash enclosure, all of which encroached that setback; (2) the minimum front-yard setback of seventy-five feet needed to accommodate the underground tanks, which encroached that setback; (3) the steep slope provision setting 49.6% as the maximum allowable hard surface area needed because plaintiff proposed 51.3%; (4) the non-disturbance of soil or vegetation within seventy-five feet of the top of the bank of an existing stream needed because plaintiff proposed disturbance within seventy-five feet; and (5) the prohibition barring the building of structures within 100 feet of the top of the bank of an existing stream needed because plaintiff proposed disturbance within 100 feet.

Phillips addressed the buildings and structures that would encroach on the front yard setback area. Concerning the canopy over the gas station, he testified that "[a] canopy obviously is not the same as a building. There is not nearly as much mass or surface footprint as compared to a building." Phillips also addressed the steep slope provision ordinance that required "maximum allowable hard surface area" of 49.6%. He noted that the 51.5% hard surface coverage proposed complied with the 55% maximum permitted in the B-2 zone; however, he acknowledged the steep slope provision ordinance reduced the maximum permitted hard surface coverage on the property from 55% to 49.6%. Phillips opined the proposed 51.5% coverage was minimal because the steep

9

slopes that would be impacted were "manmade" and exceeding the 49.6% coverage "would not . . . cause a serious concern."

Regarding the required setback of seventy-five feet for the underground tanks, he also stated, "the tanks are located in the most appropriate portion of the site, given the layout of the operation," and explained that the fueling unloading operation would not impede or disturb "vehicular flow or circulation for that matter on nearby properties." Concerning the 100-foot setback and the seventy-five-foot non-disturbance requirements, Phillips testified that he believed the need for variance relief from these requirements was "not related to this specific development proposal, but a function of the unique characteristics and constraints of the site itself." He further explained that "any development proposed on this property would have to seek variances from the buffer requirement and/or relief from the setback requirements."

Phillips opined that "the proposed development can achieve the purposes of protecting the stream and the associated natural resources despite the deviation." He based his opinion on the fact that "there is no disturbance proposed on the physical bank of the stream. The existing wood line along the bank would be preserved[,]" and "[a]dditional landscape plantings would be provided within the buffer zone." He stated further that the existing commercial

10

building on the lot, which would be removed for the proposed development, was "almost entirely within the 100-foot buffer zone."

Plaintiff also sought approval to deviate from the following requirements under ordinance section 16.68.050.B: (1) the provisions concerning general lighting designs; (2) the provision requiring a seventy-five-foot landscape buffer yard depth adjacent to a residential dwelling[3], needed because plaintiff proposed a 38.7-foot landscape buffer yard; (3) the use of high-density polyethylene pipes provision, needed because plaintiff proposed the use of reinforced concrete pipes instead; (4) the provision requiring shade trees be planted along adjacent streets, needed because plaintiff proposed planting shade trees along Route 31; (5) the provision providing replacement trees be planted on-site and plaintiff proposed they be planted off-site; and (6) the provisions concerning circulation and parking designs.

Phillips addressed the buffer yard ordinance that "requires [seventy-five] feet between the site and the adjacent lot." Plaintiff proposed less than seventy-five feet to the adjacent lot, identified as Lot 22. Phillips testified that the landscape buffer proposed provided "an effective visual screen to Lot 22 under

_____

[3] Lot 22, adjacent to the property, had a residential building on it even though it was not situated in a residential zone.

the circumstances," meaning "the site constraints in terms of buildable envelopes; as well as the fact that the residence on Lot 22 is nonconforming, and not permitted or envisioned within the current B-2 scheme."

Under ordinance section 16.68.050.C, which required off-street parking and loading facilities be designed as to cause minimum interference with traffic or abutting streets, plaintiff proposed that the unloading space for the fueling truck deliveries to the gas station be in the front yard setback area, which was not permitted. Ordinance section 16.68.050.D required that the proposed development provide a minimum seventy-five-foot landscaped buffer-yard width to screen the residential dwelling on Lot 22, and plaintiff proposed twenty-three feet. Phillips addressed the buffer-yard depth under section 16.68.050.B. Ordinance section 16.68.050.E required compliance with all applicable provisions of Articles IV, V and Title 16, specifically the ordinances concerning soil erosion, stormwater control and flood plain control regulations.

As to environmental concerns, Phillips relied on the testimony of plaintiff's underground storage tank and environmental compliance and safety expert, Tomlinson Fort, "that the service station facilities and equipment that are used by Wawa, and also Wawa's management practices, meet[]s or exceed[]s State and Federal standards." Fort testified extensively as to Wawa's

12

construction standards, equipment, and safeguards. He specifically testified as to the underground storage system design, stormwater management and construction safe grounds, and Wawa's equipment maintenance program. He opined the design of the tanks was "safe," and as to Wawa's employee training, readiness to deal with incidents that may occur, and 24/7 emergency preparedness. Phillips opined that the plaintiff satisfied the positive criteria for d(3) variances concerning the proposed development because "the site can accommodate any potential problems associated with these bulk and site deficient deviations."

As to negative criteria, Phillips opined the gas fueling station and convenience store were permitted in the B-2 zone. He testified the residential lot, Lot 22, adjacent to the proposed development was "nonconforming" and a buffer was being provided. The existing residence dwelling and commercial building on the lot were "in a dilapidated condition," and he stated removing them "would remove those [eyesores], and basically improve it with a modern facility that [he] think[s] is consistent with the intent and purpose of the B-2 district."

Phillips further opined on the negative criteria of the d(3) variance that the proposed use would not "substantially impair the intent of the [m]aster [p]lan

and [z]oning [o]rdinance," and the gas station use "meets the requirements set forth in the conditional use standard. The development satisfies all of the specific conditional use standards for the gas station component, and the deviation sought from the bulk and site design can be accommodated." On cross-examination, he conceded the entirety of the seventy-five-foot non-disturbance area would be disturbed, and that the proposed development would increase the number of structures in the 100-hundred-foot non-disturbance area.

C.    C Variances

Plaintiff applied for nine c(1) and c(2) variances. The Board divided the variances into five categories. First, plaintiff applied for bulk variances for encroachment of buildings/structures into the seventy-five-foot front yard setback requirement, specifically the canopy over the gas station, the convenience store, and the trash enclosure. Second, plaintiff applied for a bulk variance for deviation from the steep slope provision, which sets a maximum allowable hard surface area of 49.6%. Third, plaintiff applied for a bulk variance for encroachment of the underground tanks into the seventy-five-foot front yard setback area. The Zoning Relief Table indicated that one of the tanks would have a setback of 41.0 feet and the other 14.4 feet.

Jeffery Martell was plaintiff's engineering expert. He opined that the

14

whole site "is designed to be safe and to be efficient and designed for function for its intended use."  Martell proposed that the location of the tanks would be "at the southeast corner of the site, near the intersection of Route 31 and New Castle Way."  He stated one of the reasons for choosing this location was for vehicular traffic concerns and a safety standpoint.  According to Martell, the location was safe for the trucks to fill the underground storage tanks.

Redel testified Wawa requested variances for the underground tanks that encroached into the seventy-five-foot setback area.  If the storage tank was placed "between the store and the fuel canopy, it would be outside of the setback"; if situated behind the store, "then the piping run would be extremely long"; and would be prohibited because of the "wetland buffer behind the store."  On cross-examination, Redel explained the Township has an ordinance that prevents changing a setback based on a prototypical layout as Wawa proposed.

Fourth, plaintiff applied for a bulk variance for deviation from the ordinance requiring non-disturbance of soil or vegetation within seventy-five feet of the top of the bank of an existing stream.  Plaintiff had proposed disturbance within seventy-five feet.  As to the seventy-five-foot buffer variance, Martell proposed a disturbance into the seventy-five-foot non-disturbance area and produced an exhibit outlining the disturbance.  He also

testified as to the revised engineering plans that plaintiff submitted in response to the prior review letters from the Township representatives. He discussed the corrections made to the exhibits, and he stated the revised plan included "a small retaining wall . . . to attempt to create a more natural graded corridor area along the steam [sic]" and increased the landscaping and vegetation in that area. Martell further testified "all of the area[s] that [are] being proposed to be disturbed [are] essentially areas that are either paved or they are within maintained lawn areas." He also testified as to revisions made to the plans after reviewing reports from the Township engineer, the Board's planner, and the Board's landscape architect. Martell clarified that the proposal was to disturb the "entirety" of the seventy-five-foot buffer area.

Finally, plaintiff applied for deviation from the ordinance barring any structure within 100 feet of the top of the bank of an existing stream. Martell produced an exhibit outlining the proposed building's encroachment into the buffer. He testified "[t]he project has no impact to the channel itself, there is no disturbance of the physical bank or anything of that nature. We are reducing runoff from the site into that channel."

The Board's counsel expressed confusion as to Martell's exhibits concerning the buffer and stated the following:

There are two things I don't understand. First, I don't think your [e]xhibit D2 is reflecting how the [o]rdinance is set up when it says no structures within the [100-]foot buffer, but structures are not just buildings, they are buildings and curbing and paving, and I don't think D1 requests what the [o]rdinance set up. If you have a permanent structure, it is supposed to be [100] feet away from the stream bank. The Board recognizes that to construct a permanent structure or building, sometimes you have to have [twenty-five] feet closer to the stream bank to do the construction. So[,] I think the exhibits are wrong.

Not only do they not accurately reflect what the [o]rdinance is requiring, but the calculations are wrong, also.

Martell agreed to correct the exhibits to be consistent with the ordinance.

As to revisions to the exhibit, Martell testified the plan now included "structures [such] as pavements, curbs, retaining walls, storm pipes . . . that we believe should be considered structures under the setback." When asked whether the proposed encroachment within that 100-foot buffer would be worse than what the plans showed, Martell responded, "Both the existing and proposed conditions will show more structures."

Concerning the subsequent revisions Martell made to the 100-foot-buffer exhibit, he proposed an increase in the number of structures within 100 hundred feet of the streambank based on the exhibit. He was aware that the ordinance required no structure within 100 feet of the top of the streambank. At the

A-1563-20

conclusion of his testimony, Martell stated the 100-foot buffer exhibit would be revised to include the basin area, which fell within the definition of a structure.

Fort testified as to the 100-foot buffer structure setback prepared by Martell. At issue was the encroachment of the parking lot in this area. Specifically, as to storm runoff from the parking lot, Fort stated:

> [M]y understanding of it is the entire paved parking area runs into a series of inlets which ultimately are filtered and go into subterranean and detention and in a steel trap out of the water system. I don't believe there is much, if any, sheet flow directly from the paved area to the stream. I again defer to the engineering company on that.

D.    Objectors' Testimony

Objector U.S. Fuel called Carl Peters as its engineer and planning expert. Peters prepared six visual exhibits related to the site. Notably, exhibits OG-3 and OG-4 outlined the proposed development. He described exhibit OG-3 as follows:

> You will note the section of the convenience store which is proposed to be constructed in the allowable zone is shown in green. The portion of it which is shown is in a prohibited building zone which is shown in red, and my analysis shows [sixty-five] percent of the store is proposed to be constructed in an allowable building area; and [thirty-five] percent of the store area is proposed for prohibited building areas. The canopy itself is almost entirely to be constructed within the front yard setback area. There is a tiny little corner here

18

that would be within the permitted zone, which is less than five percent of the area of the canopy.

Peters described OG-4 as follows:

> On this diagram I have shown hard surfaces that are outside of the permitted areas. We have this portion to the left, which is encroaching into the stream and residential setback areas; we have pavement that is too close to the street on the Route 31[-]side and the New Castle Way[-]side. We also have the trash enclosure area in the front yard of New Castle Way. We have the fuel storage area, which is in both front yard areas for [Route] 31 and for New Castle Way.

As shown in the exhibits, the proposed development was clearly oversized for the site, with thirty-five percent of the proposed development being constructed in prohibited areas.

Peters opined plaintiff did not meet the requirements for d(1) and d(3) variances and the site could accommodate a use that was permitted in this B-2 zone. He prepared two exhibits, one outlining only a proposed convenience store and one only having a fueling station. He described the proposed convenience store exhibit as smaller and fitting

> within the [twenty-]foot offset from the street right of way lines. We have sufficient parking, [thirty-six] parking spaces, which meets the Town[ship's] standard for a store that size.
>
> There is room for a loading zone, trash and recycling areas. This would require some

encroachments into the [100-yard] buffer for some driveways for fire safety, but it would reduce substantially the magnitude and number of variances requested.

Peters also described the proposed fueling station exhibit as smaller and said it would include "a fueling station with four pumps, a small accessory structure for restrooms, offices and some storage. This is a 700 square foot building with associated parking, and this could fit on the site within the building setback lines and the [100-]foot stream buffer zone." On cross-examination, Peters acknowledged U.S. Fuel was a competitor and agreed it would not inure to the "benefit" of U.S. Fuel if a Wawa was constructed at the proposed site.

Next to testify was objector Wellington Hills's planning expert, Michael J. Pessolano. He opined that the site was "particularly unsuitable for the proposed dual uses" and noted the many variances plaintiff sought. Pessolano opined the encroachments were not "de minimus," such as ninety-one percent of the canopy in the front yard setback. Concerning the ordinance requirement as to loading facilities, Pessolano noted the location where the fuel would be loaded was:

> [A]n important issue because in a community that cares about its space around its buildings, and this Board and the Planning Board work very hard to make sites look nice with landscaping and setbacks and building designs to encourage and allow a tank[er] truck to be

20

parked a lot of the time on the site, in a very prominent location in the front most portion of the site. It is extremely disharmonizing with the intent and purpose of the [z]one [p]lan and [z]oning [o]rdinance.

### E. The Public's Concerns

Members of the public voiced their concerns regarding the proposed development, mostly related to the traffic impact the proposed development would have. They prepared several exhibits outlining their concerns. One public member prepared a PowerPoint presentation and provided a paper copy of it to the Board. Her presentation included pictures concerning the heavy traffic congestion at the site from October 2018 to November 2018.

### F. Final Hearing

On September 19, 2019, the Board unanimously voted to deny plaintiff's application. The Board found that a d(1) variance was required because the proposed development was for two separate uses. In addition, the Board determined plaintiff did not meet the positive criteria for d(1) and d(3) variances, and the proposed development was oversized for the site. Thereafter, on November 7, 2019, the Board adopted resolution number 2019-16, ratifying the denial of plaintiff's application.

On January 16, 2020, plaintiff filed a complaint in lieu of prerogative writs challenging the Board's decision. On April 9, 2020, the trial court heard oral

argument on plaintiff's motion for leave to amend the complaint to add the Township as a defendant. On April 13, 2020, the trial court filed a consent order executed by counsel for the parties, withdrawing with prejudice, plaintiff's motion to add the Township. The consent order also provided:

> 2. Plaintiff can argue that the [g]eneral [c]onditions applicable to all [c]onditional [u]ses, as set forth in Raritan [o]rdinance [s]ection 16.68.050, do not apply to [p]laintiff's [a]pplication, and [p]laintiff can argue that the Board should have treated the deviations from the [g]eneral [c]onditions at issue as "c" bulk variances only; not as "d(3)" conditional use variances.

> 3. Plaintiff cannot argue that the [g]eneral [c]onditions set forth in Raritan [o]rdinance [s]ection 16.68.050 fail to contain "definitive specifications and standards[,"] are not "clearly set forth with sufficient certainty and definiteness[,"] are otherwise contrary to N.J.S.A. 40:55D-67 and/or any other provisions of the [Municipal Land Use Law (MLUL)], and/or arbitrary, capricious, unreasonable, otherwise unlawful and/or otherwise invalid, whether the challenge is on a per se and/or as applied basis.

On November 20, 2020, the trial court conducted a hearing on plaintiff's prerogative writs action. In a comprehensive January 8, 2021 oral decision, the trial court affirmed the Board's resolution. The court concluded the Board's findings were well-supported by the record, and its decision conformed with the provisions in the Township ordinances pertinent to plaintiff's application and the MLUL, specifically N.J.S.A. 40:55D-3, which addresses conditional uses of

22

a property.  In its decision, the court highlighted plaintiff's application requested nine "c" variances, and the proposed development constituted a "significant encroachment" into an area that had "environmental constraints."  On January 14, 2021, the trial court entered a final judgment memorializing its decision. This appeal followed.

## II.

Plaintiff reiterates that the Board's decision to require a use variance was contrary to law, and was arbitrary, capricious, and unreasonable because the denial was not supported by the evidence.  Plaintiff argues a d(1) use variance was not required for its application because "there is no provision in the Raritan [o]rdinance that specifically permits or prohibits multiple uses or mixed uses on the same lot."  In plaintiff's view, the Board's ruling requiring a d(1) use variance for the application "rested solely on its interpretation that the convenience store is retail 'use' (in the singular) and the gasoline fueling station is a conditionally permitted 'use' (again, in the singular)."  Plaintiff also contends that denial of its conditional use variances and bulk variances was contrary to law.  We disagree.

"[T]he role of a judge in reviewing a local variance determination is solely to ascertain whether the action of the board is arbitrary."  Kenwood Assocs. v. Bd. of Adj., 141 N.J. Super. 1, 4 (App. Div. 1976).  The judge "cannot substitute

A-1563-20

his [or her] own judgment for that of the municipal board invested with the power and duty to pass upon the application." Ibid.; see also Advance at Branchburg II, LLC v. Twp. of Branchburg Bd. of Adj., 433 N.J. Super. 247, 253 (App. Div. 2013) (holding "the applicant bears 'the heavy burden of proving . . . the board's action . . . to be arbitrary, capricious or unreasonable" (quoting Med. Realty Assocs. v. Bd. of Adj., 228 N.J. Super. 226, 233 (App. Div. 1988))).

"The board of adjustment weighs the facts and the zoning considerations, [p]ro and [c]on, and will be sustained if its decision comports with the statutory criteria and is founded in adequate evidence." Mahler v. Bd. of Adj., 94 N.J. Super. 173, 185-86 (App. Div. 1967). We apply the same standard of review as the trial court. Grubbs v. Slothower, 389 N.J. Super. 377, 382 (App. Div. 2007) (quoting Fallone Props., L.L.C. v. Bethlehem Twp. Plan. Bd., 369 N.J. Super. 552, 561 (App. Div. 2004)).

"The action of the [B]oard is presumed to be valid." Kenwood, 141 N.J. Super. at 4. "[L]ocal officials 'who are thoroughly familiar with their community's characteristics and interests and are the proper representatives [sic] of its people are undoubtedly the best equipped to pass initially on such applications for variance.'" Medici v. BPR Co., 107 N.J. 1, 14-15 (1987) (quoting Kramer v. Bd. of Adj., 45 N.J. 268, 296 (1965)). Only a showing by

24

the plaintiff of "clear and compelling evidence" may overcome this presumption. See Spring Lake Hotel & Guest House Assoc. v. Borough of Spring Lake, 199 N.J. Super. 201, 210 (App. Div. 1985); see also Dome Realty, Inc. v. City of Paterson, 83 N.J. 212, 235 (1980) ("[C]ourts place a heavy burden on the proponents of invalidity."). Applying the above standards, we discern no reason to reverse.

Under the MLUL, a zoning board of adjustment has the power to grant a variance to permit, among other things, "(1) a use or principal structure in a district restricted against such use or principal structure, [and] (2) an expansion of a nonconforming use." N.J.S.A. 40:55D-70(d).

> To justify a "d" variance, an applicant must fit within at least one of the three "special reasons" categories set forth in N.J.S.A. 40:55D-70(d):
>
> > (1) where the proposed use inherently serves the public good, such as a school, hospital or public housing facility; (2) where the property owner would suffer undue hardship if compelled to use the property in conformity with the permitted uses in the zone; and (3) where the use would serve the general welfare because the proposed site is particularly suitable for the proposed use.
>
> [Dunbar Homes, Inc. v. Zoning Bd. of Adj., 233 N.J. 546, 552 n.3 (2018) (quoting Nuckel v. Borough of Little Ferry Plan. Bd., 208 N.J. 95, 102 (2011)).]

These "special reasons" are often referred to as the "positive criteria." See, e.g., Sica v. Bd. of Adj., 127 N.J. 152, 156 (1992).

The Board found that a convenience store with a gasoline fueling station did not constitute a combined single use and, therefore, plaintiff was required to apply for a d(1) use variance. Specifically, plaintiff asserts that the plain language of the ordinance reveals a convenience store with a fueling station "meets the express 'purpose' (singular) of the B-2 [z]one" and in two cases, the Raritan Planning Board took jurisdiction and decided applications based on the proposed use being a single permitted conditional use.

The MLUL, N.J.S.A. 40:55D-1 to -163, grants a zoning board of adjustment the power to decide requests for interpretation of a zoning ordinance. N.J.S.A. 40:55D-70(b). The interpretation of a zoning ordinance is purely a legal determination, and the determination of a zoning board on the question is not entitled to a presumption of validity. Fallone Props., 369 N.J. Super. at 561 (quoting DePetro V. Twp. of Wayne Plan. Bd., 367 N.J. Super. 161, 174 (2004)). However, courts will give deference to a municipality's informal interpretation of its ordinances. Ibid. (quoting DePetro, 367 N.J. Super. at 174). "[A]lthough we construe the governing ordinance de novo, we recognize the [B]oard's knowledge of local circumstances and accord deference to its interpretation."

Id. at 562. Nonetheless, deference is limited, and the meaning of an ordinance's language is a question of law that the court will review de novo. Bubis v. Kassin, 184 N.J. 612, 627 (2005).

In construing ordinances, determining municipal intent is no different from interpreting and construing statutes. Atl. Container, Inc. v. Twp. of Eagleswood Plan. Bd., 321 N.J. Super. 261, 269 (App. Div. 1999). Thus, a zoning ordinance should be interpreted to effectuate the intent of the adopting body, considering the language used and the objective sought to be achieved. See Twp. of Pennsauken v. Schad, 160 N.J. 156, 170 (1999). The first step is to examine the language of the ordinance. Ibid. If the language is clear and unambiguous, its meaning controls; if, however, the language is susceptible to different interpretations, then extrinsic factors, such as the ordinance's purpose, legislative history and context must be considered. Ibid. "The general principle is that ordinances should be liberally construed in favor of the municipality." Atl. Container, Inc., 321 N.J. Super. at 280. However, prohibition "of a use must be stated with clarity." Tr. Co. of N.J. v. Plan. Bd., 244 N.J. Super. 553, 567 (App. Div. 1990).

Here, the ordinance provided that a convenience store was a principally permitted use, and a gasoline fueling station was a conditional use. The

ordinance outlined the purpose of the B-2 zone as follows: "It is the purpose of this zone to define and provide controls for the major shopping and business areas of the Township, serving the needs of both Township residents and the regional population, and transient highway users."

The record amply supported the Board's finding that plaintiff's application sought approval for two separate uses. And, the trial court aptly noted that "even if it was subject to some level of debate, the Board is entitled to some level of deference in interpreting their . . . own ordinance." The court determined that the Board was correct in not treating the two separate uses as a combined single use because it was contrary to the plain language of the ordinance, which prohibited multiple and mixed uses. In its resolution, the Board noted that a gasoline station was allowed as a conditionally permitted use pursuant to ordinance section 16.26B.030, and a convenience store was allowed as a principally permitted use pursuant to section 16.26B.020. Therefore, the trial court properly found it was appropriate for the Board to hold that multiple mixed uses were specifically prohibited because they were not expressly permitted.

Moreover, the trial court agreed with the Board's finding that expert testimony was irrelevant as to interpreting the language of the ordinance because it was a legal issue for the court to decide. The court was correct in its analysis.

28

See Boddy v. Cigna Prop. & Cas. Cos., 334 N.J. Super. 649, 659 (App. Div. 2000) (holding expert witnesses may not render opinions on matters which involve questions of law).

Plaintiff also cites two applications the Raritan Township Planning Board reviewed in which a combined convenience store and fueling station was treated as a single use. One was the Citgo application in 2001, now the site of the present objector, U.S. Fuel. Plaintiff claims the Planning Board approved a Citgo fueling station and a convenience store on the same lot. U.S. Fuel is located a mile south of plaintiff's site, and "[t]here was no mention of a [u]se [v]ariance in the [r]esolution of [a]pproval for the Citgo, nor any mention of a conditional use variance, or any mention of the number of principal uses of the lot." The other application was in 2017 for a Wawa convenience store with a fueling station on Route 202. While plaintiff claims this application was denied based on the hours of operation ordinance, it contends "the Planning Board treated the application as a permitted single use without the need for a use variance or conditional use variances." We are unpersuaded.

As to the two prior applications plaintiffs cited, the trial court agreed with the Board's determination it was "undisputed that the Planning Board did not interpret the ordinances at issue and did not make a determination in either of

29

the resolutions at issue that a combined gasoline station and convenience store was a singular use or that multiple principal uses are permitted in the B-2 zone." (emphasis added). The Board disagreed with Phillips's opinion "that by accepting jurisdiction over two applications submitted for gas stations with convenience stores, the Raritan Township Planning Board implicitly determined that those two principal uses were permitted on one lot." With regard to the two prior applications, the Board found no objectors argued before the Planning Board "that the combined uses were prohibited multiple uses on the lots in question."

Further, the Board noted that even if the Planning Board accepted jurisdiction over the two prior applications, "planning board interpretations and jurisdictional rulings are not binding on boards of adjustment." The Board stated that the MLUL granted boards of adjustment, not planning boards, the authority to interpret ordinances, citing Colts Run Civic Ass'n v. Colts Neck Township Zoning Board of Adjustment, 315 N.J. Super. 240, 246 (Law Div. 1998). Moreover, the Board determined that, even if the Planning Board accepted jurisdiction, its "jurisdiction ruling would be erroneous."

The Board cited Citizens for Equity v. New Jersey Department of Environmental Protection, 126 N.J. 391, 396 (1991), in support of its assertion

"that government has a duty to correct itself." In its conclusion, the Board noted, "assuming for argument's sake only that the fact that the Planning Board accepted jurisdiction of the two prior gas station applications evidences how the Planning Board has treated this issue, the Planning Board's jurisdictional ruling is erroneous."

Here, review of the resolutions for the two referenced applications supports the Board's finding there was no evidence that the question of whether a convenience store with a gasoline fueling station was considered a combined single use was ever raised or decided. As to Citgo's application, which was also for a business located in the B-2 zone, although the Planning Board stated, "[a]s is the case with most new gasoline stations, a convenience store is also proposed for the site," this did not imply the question of whether multiple uses were permitted or whether a convenience store with a gas station was a combined single use had been decided. Indeed, when read in its entirety, the Planning Board treated the convenience store as an accessory use because it stated that "[a]ccessory goods for sale at the filling station may be displayed out of doors only on the pump islands but only if such display materials are contained within a suitable metal stand or rack."

In the 2017 Wawa application, which the Planning Board denied due to

A-1563-20

the Township's twenty-four-hour ordinance, the proposed development also consisted of a convenience store with a gasoline fueling station in the B-2 zone. The applicant also applied for a conditional use variance. While plaintiff argues the resolution expressly "treats" the store and gas station as a single use, there is no indication in that resolution the issue of whether a convenience store with a gas station was considered a combined single use was ever raised or decided. Paragraph twenty-one of the resolution states, "[t]he development proposed by the application is a conditional use in the B-2 [z]one." The Planning Board either did not consider the issue or treated the convenience store as an accessory use. We are satisfied the Board correctly found that boards of adjustment, not planning boards, interpret ordinances. N.J.S.A. 40:55D-70b; see also Colts Run Civic Ass'n, 315 N.J. Super. at 246 (holding board of adjustments decide requests for interpretation of zoning ordinance).

Plaintiff also argues that support for its single use position is found in the planning treatise, The Completed Illustrated Book of Development Definitions, authored by Harvey S. Moskowitz and others. See Moskowitz, et al. The Complete Illustrated Book of Development Definitions (4th ed. 2015). This treatise defines "Gasoline Station and Convenience Center" as "[a] retail facility combining a gasoline station and convenience store" in its comment to the

definition as follows:

> In such establishments, attempts to distinguish whether one of the uses is principal and the other secondary or accessory are of little value. Convenience stores on the same lot as gasoline stations have become so commonplace that where the size of the parcel of land can accommodate both and land use regulations permit them, they are almost always provided together.

The Board was unpersuaded by the Moskowitz definition because a convenience store with a gasoline station were "almost always provided together" occurred only when "the size of the parcel of land can accommodate both" gas station and convenience store and land use regulations permit them, which was not supported in this application because "the size of the property will <u>not</u> accommodate both uses as too much development is being proposed on the property, as is evidenced by the large number of 'c' variances and site plan exceptions that are required." (emphasis added). The trial court agreed with this reasoning, specifically finding the Township land use regulations did not expressly permit the combined use and the ordinance defined principal use as the main purpose in the singular and not plural.

We reject plaintiff's reliance on the Moskowitz comment. Notably, the comment expressly states that two uses are only provided together if the site can accommodate both and if land use regulations permit them. As evidenced by

33

the exhibits plaintiff's experts submitted during the hearings, the site cannot accommodate both uses due to the over-sized nature of the proposed development.

Plaintiff further contends the record does not support the Board's finding that its interpretation of the ordinance was supported by the fact "the Raritan Planning Board conducted a master plan reexamination in [2019] and did not change the definition of a principal use nor did it define a filling station with a convenience store as a single permitted use." Here, during the pendency of plaintiff's application, the Planning Board adopted the February 27, 2019 Reexamination Report in accordance with N.J.S.A. 40:55D-89, which requires that planning boards reexamine their master plans and development regulations every ten years. The Reexamination Report did not change the definition of principal use or change the list of principally permitted uses.

Saliently, the trial court found that "the failure to change the ordinance as reflected by the Reexamination Report goes considerable distance in supporting the Board's interpretation of the ordinance here." The court relied on Medici, 107 N.J. at 20-21, for the proposition if the board of adjustment did not change an ordinance during its revisions to the Master Plan, it may reasonably infer that the inaction was intentional.

The Board rejected Phillips's opinion that the two uses were "consistent with at least two of the goals of the updated land use goals of the 2019 Reexamination Report, which basically targets growth to the existing roadway corridors." The Board assumed (since Phillips did not specifically reference them in his testimony) that the updated goals at issue were: (1) "[l]imit growth to existing roadway capacities"; and (2) "[p]ermit additional non-residential development."

As to the first goal, the Board found that the proposed two uses were "inconsistent with the goal and objective of 'limiting' growth to 'existing roadway capacities.'" Relying on exhibits OP-1 and OP-2 portraying the traffic congestion at this site, the Board found that "Route 31 in the area of the property has reached its functional, if not its actual, capacity at this time." Concerning the second goal, the Board found "any application for non-residential development could be argued to be consistent with this goal," but it "doubt[ed] that [wa]s what the Planning Board had in mind when it included this goal and objective in the Reexamination Report." It added, "[t]his is especially so in light of the prior goal and objective of 'limiting' growth to existing roadway capacities."

Finally, the Board noted that the Reexamination Report did not change the

35

definition of principal use "from 'the main purpose for which any lot and/or building is used' to defining principal use in terms of allowing multiple uses." The Board noted that there was also no "change to the principally permitted use section of ordinance 16.626B.020 which governs the B-2 zone to specifically allow more than one principally permitted use on a lot."

In Medici, cited by the trial court and in the resolution, the Court held an applicant seeking a use variance for a commercial purpose must establish by enhanced proof that the variance is not inconsistent with the intent and purpose of the master plan and zoning ordinance. 107 N.J. at 4. The zoning ordinance in Medici did not permit hotels or motels; however, the board of adjustment had previously approved three use variances for such uses. Ibid. The Court reversed the grant of the use variance because the applicant had not met "the formidable burden of proving that the grant of another use variance for a motel at this site was not inconsistent with the intent and purpose of the zoning ordinance as reflected by the governing body's failure to authorize motels as a permitted use in the zone." Id. at 25-26.

The Court in Medici noted that reexamination by the planning board of the master plan and zoning ordinance was "intended to inform the governing body of the need for revisions in the plan and ordinance based on significant

changes in the community since the last such reexamination." Id. at 20. Further, "[w]hen an informed governing body does not change the ordinance, a board of adjustment may reasonably infer that its inaction was deliberate." Id. at 20-21.

Notably, Antoine Hajjar, the Planning Board engineer, and Jessica Caldwell, the Planning Board planner, were present when the issue of whether a d(1) variance was required was raised in the matter under review. Either Hajjar or Caldwell, or sometimes both, were present on all dates when testimony was taken. Hajjar's[4] name appears on the Reexamination Report, and Caldwell was also a writer for the Reexamination Report. Thus, the Board was correct to find the Planning Board was aware of this issue and its choice to make no changes despite that knowledge more likely than not shows a conscious decision not to allow the uses as combined principal permitted uses.

Finally, plaintiff asserts the trial court was "misled" by the Board's argument that the holding in Sun Co. v. Zoning Board of Adjustment, 286 N.J. Super. 440 (App. Div. 1996), required a d(1) use variance for its application. Plaintiff argues that Sun was decided twenty-five years ago and has been "distinguished and not followed in subsequent reported cases and unreported cases dealing with the issue of a combined convenience store with fueling

---

[4] Also known as "Tony" in the Reexamination Report.

station." It claims that the "opinions deciding cases involving interpretations of use issues related to fueling stations and convenience stores are clear that where filling stations are permitted and where retail stores are permitted, they are permitted together."

In Sun, the applicant sought an interpretation of the Avalon zoning ordinance to determine whether both a convenience store and a gas station were permitted uses in the relevant zone. 286 N.J. Super. at 442. The zoning board found that two principal uses were not permitted on one lot without a variance. Ibid. The trial court reversed the zoning board's determination, and we reversed and reinstated the complaint. Id. at 447-48. Although there was no definition of principal use in the ordinance, this court held that not more than one principal use was permitted on a lot without a variance. Id. at 446-47. We further noted, "[a]lthough the ordinance is permissive, the usual rule of construction of zoning ordinances is that where a use is not expressly provided for it is prohibited." Id. at 444.

In discussing the ordinance, this court noted:

> [E]ach zone listed in the ordinance specifies both principal and accessory uses. Even though the zoning ordinance does not expressly state that a lot may have only one principal use or even that a lot may have a principal and [an] accessory use, obviously one lot may have both an accessory and principal use, provided such

a use conforms to the ordinance's requirements and the accessory use is an ancillary one. Accessory uses generally are required, as in [the municipality]'s ordinance, to be those which are incidental to the principal use.

[Id. at 445 (citations omitted).]

We emphasized that the ordinance stated:

[A]n accessory use may not be "any activity normally conducted as a business." Hence, the operation of a convenience store would not be an accessory use not only because it is a principal use, but because it is a very different business from the use of a gasoline filling station or garage. In addition, an accessory use generally compliments or relates to the principal use.

[Id. at 446.]

While plaintiff acknowledges the ruling in Sun, it argues that the holding is outdated, and subsequent case law has recognized a convenience store with a gas station as a single use. Plaintiff cites three published and six unpublished cases in support of this assertion.[5]

In Jai Sai Ram, L.L.C. v. Planning/Zoning Board, the applicant sought a use variance to construct a Wawa convenience store with a gas station on

[5] "No unpublished opinion shall constitute precedent or be binding upon any court." R. 1:36-3. Unreported decisions "serve no precedential value, and cannot reliably be considered part of our common law." Trinity Cemetery Ass'n, Inc. v. Twp. of Wall, 170 N.J. 39, 48 (2001) (Verniero, J., concurring).

property located partially in a highway development zone and partially in a residential zone. 446 N.J. Super. 338, 340-41 (App. Div. 2016). At the time, the ordinance did not permit the proposed use in either zone. Id. at 341. We noted that "[i]t also was not clear whether the Board would consider a combined gas station/convenience store to constitute two principal uses on a single lot, which was also prohibited under the zoning ordinance." Ibid.

After the applicant filed the application, the municipality amended its ordinance, rezoning the site of the proposed Wawa and the surrounding area to "a special economic development (SED) zone." Ibid. "However, the SED zone did not specifically provide for a combined gas station/convenience store use," and the ordinance's prohibition against two principal uses on a single lot remained. Ibid. The zoning board granted the application, finding that the combined convenience store with a gas station constituted one principal use of the property. Id. at 342. The plaintiffs filed an action in lieu of prerogative writs challenging the zoning board's decision, and the trial court affirmed. Ibid.

During the pendency of the appeal, the municipality amended the ordinance to "designate 'single use retail sales [and] gasoline filling stations operated by a single business entity . . . not part of a planned development'" that a convenience store with a gas station as a permitted principal use in the SED

zone. Ibid. (second alteration in original). The issue on appeal was whether N.J.S.A. 40:55D-10.5, which obviated "the time of decision rule" that had allowed municipalities to "change the zoning to the developer's detriment while the application was pending," should be construed "to prevent a favorable land use amendment from applying to a pending application." Id. at 343, 345. We determined the appeal was moot because the amended ordinance permitted the use. Id. at 345. In a footnote, we noted that we would have affirmed the granting of the use variance for reasons stated by the trial court even if the appeal were not moot. Ibid. n.5.

Jai Sai is factually distinguishable because the Township here did not amend the ordinance at issue to designate as a single use what had been separate uses. While plaintiff relies on the Jai Sai footnote stating we would have affirmed the use variance even absent the amendment, we are unpersuaded because the ordinance, in that case, was different than the one at issue here. Again, the ordinance here permitted the convenience store as a principally permitted use and the gasoline fueling station as a conditional use.

III.

A.    Denial Of D(1) Variance

As an alternative to its argument that a convenience store with a gasoline

41

fueling station is a combined single use as a matter of law, plaintiff contends denial of the d(1) variance was not supported by the evidence and was arbitrary, capricious, and unreasonable.  Pursuant to the MLUL:

> No variance . . . may be granted under the terms of this section, including a variance or other relief involving an inherently beneficial use, without a showing that such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.
>
> [N.J.S.A. 40:55D-70(d).]

Only exceptional circumstances warrant variance relief, as there exists a "strong legislative policy favoring zoning by ordinance rather than by variance." Medici, 107 N.J. at 23.  The reviewing court must focus on the validity of the board's action and cannot substitute its judgment for that of the board.  CBS Outdoor, Inc. v. Borough of Lebanon Plan. Bd./Bd. of Adjust., 414 N.J. Super. 563, 578 (App. Div. 2010).  "The court's authority and duty is to review the record before the Board in order to determine whether the Board's decision was adequately supported by the evidence."  Ibid.

A use variance may be granted upon a showing that the positive and negative criteria are satisfied.  N.J.S.A. 40:55D-70(d).  To satisfy the positive criteria, plaintiff must demonstrate special reasons for the grant of the variance.

N.J.S.A. 40:55D-70(d).  Special reasons are deemed satisfied as a matter of law if the proposed use is one that inherently benefits the general welfare.  Sica, 127 N.J. at 159-60.  For a use that is inherently beneficial (e.g., a church or a school), plaintiff is not required to demonstrate the site is particularly suitable for the proposed use, Kohl v. Mayor & Council of Fair Lawn, 50 N.J. 268, 279 (1967), or it may not be used for a permitted use (the latter known as the "hardship test" for a use variance), DeSimone v. Greater Englewood Hous. Corp. No. 1, 56 N.J. 428, 440 (1970).  If the use is not one that inherently serves the public good, as in the matter under review, then special reasons must be based on site suitability or hardship.  See Medici, 107 N.J. at 18.

In the context of whether a site is particularly suited for a proposed use,

> Although the availability of alternative locations is relevant to the analysis, demonstrating that a property is particularly suitable for a use does not require proof that there is no other potential location for the use nor does it demand evidence that the project "must" be built in a particular location.  Rather, it is an inquiry into whether the property is particularly suited for the proposed purpose, in the sense that it is especially well-suited for the use, in spite of the fact that the use is not permitted in the zone.
>
> [Price v. Himeji, L.L.C., 214 N.J. 263, 292-93 (2013).]

The Price Court recognized in the context of a specific property, particular suitability "means that strict adherence to the established zoning requirements

43

would be less beneficial to the general welfare." Id. at 287.

The negative criteria require proof the variance "can be granted without substantial detriment to the public good and [that the variance] will not substantially impair the intent and the purpose of the zone plan and zoning ordinance." N.J.S.A. 40:55D-70(d). For a use that is not inherently beneficial, an applicant must offer "an enhanced quality of proof" the variance sought is not inconsistent with the intent and purpose of the master plan and zoning ordinance. Medici, 107 N.J. at 4. The proof must reconcile the proposed use variance with the zoning ordinance's omission of the use from those permitted in the district. Ibid.

The trial court found that plaintiff did not meet its burden for grant of a d(1) use variance. Extrapolating from the Board's resolution, the court found that the proposed development was not suitable for the site due to the "sheer number" of variances plaintiff applied for, and its personal and financial interests did not promote the general welfare. The court cited to the section in the Board's resolution finding the proposed development would encroach the entirety of the seventy-five-foot non-disturbance area, noting the possibility of plaintiff proposing a smaller development to reduce the number of required variances, and addressing Redel's testimony discussing Wawa's financial

interests.

B.    Positive Criteria

As to the positive criteria, the Board found plaintiff failed to meet its burden, and it rejected Phillips's "opinion that the 'public welfare' purposes of the MLUL . . . will be promoted by granting the 'd(1)' variance to allow the two proposed uses on the property."  The Board found while the lots contained a nonconforming residential dwelling and a conforming commercial building, it was not persuaded that demolishing these buildings would be "'more in line' with the intent of the B-2 zone."  And, the Board also found that granting the d(1) variance would not promote the general welfare because the site did not provide sufficient space for the proposed development due to the number of "c" variances, specifically "the hard surface coverage requirement, the [seventy-five]-foot[]non-disturbance area deviation, and the 100-foot building setback from the stream requirement."

The Board also rejected Phillips's opinion that granting the d(1) variance would lead to "a desirable visual environment."  Under the proposed plan, the Board noted there was no evidence establishing the proposed development "would be aesthetically more pleasing that the existing commercial building."  The Board further found plaintiff's motivations were more in line with its

45

business and financial interests than promoting the general welfare, citing <u>Beirn v. Morris</u>, 14 N.J. 529, 535 (1954); <u>Bow & Arrow Manor, Inc. v. Town of West Orange</u>, 63 N.J. 335, 346 (1973); <u>Degnan v. Monetti</u>, 210 N.J. Super. 174, 184 (App. Div. 1986); and <u>Jock v. Zoning Board of Adjustment</u>, 184 N.J. 562, 590 (2005). The Board was unpersuaded by the fact that the property was located on a highway, and it determined plaintiff did not prove the granting of a "'d(1)' use variance to allow the two uses proposed would be more beneficial to the general welfare than by allowing just one use."

Lastly, the Board found "that rather than being particularly suited, the property is particularly unsuited for the proposed development due to the over-size[d] nature of the proposed development and the sheer number of 'c' variances required to allow the proposed development on the property," and cited to <u>Cellular Telephone Co. v. Zoning Board of Adjustment</u>, 24 F. Supp. 2d 359, 368 (D.N.J. 1998). The Board further noted "it [wa]s possible that the Board would have found differently if a smaller development had been proposed, perhaps one with the convenience store being reduced in size, the number of gasoline pumps being reduced in number, and the weather protection canopy being reduced in size." There was substantial credible evidence in the record to support the Board's decision plaintiff failed to prove that the general welfare would be

promoted by granting the d(1) variance or the property was particularly suited for the two purposes proposed.

C.    Negative Criteria

As to the first prong of the negative criteria, the Board found the plaintiff did not prove that a d(1) variance could "be granted without substantial detriment to the public good in terms of impaired traffic conditions in the area." The Board found the testimony of plaintiff's traffic expert, Dean, incredible.  In addition, the Board found Dean's testimony concerning how the traffic counts were taken to be unreliable and untruthful, and noted how Dean "was obstinate and tried to dodge answering question[s]" related to how data was collected, what the rate of pay was for the individual collecting the data, and the standards of practice utilized.  See Central 25, LLC v. Zoning Bd. of Union City, 460 N.J. Super. 446, 464-65 (App. Div. 2019) (holding that when conducting "quasi-judicial" proceedings to determine whether an applicant has satisfied the statutory criteria for variances, zoning boards perform the "'judicial' role of deciding questions of credibility and whether to accept or reject testimony, expert or otherwise").  The Board is not bound "to accept the testimony of any expert."  See Klug v. Bridgewater Twp. Plan. Bd., 407 N.J. Super. 1, 13 (App. Div. 2009); see also Bd. of Educ. of Clifton v. Zoning Bd. of Adj., 409 N.J.

Super. 389, 434 (App. Div. 2009) ("Zoning boards may choose which witnesses, including expert witnesses, to believe."). Here, the traffic impact was of great concern not only to the Board, but also to members of the community.

As to the second prong, the Board found that the d(1) variance could not "be granted without substantial impair[ment] [of] the intent and purpose of the master plan and zoning ordinance." The Board found Phillips's opinion that the "variance w[ould] not substantially impair the intent and purpose of the zoning ordinance because 'the B-2 zone already allows the uses at the very least separately' entirely missed the point." The Board clarified "[t]he ordinance prohibition at issue here is not on either of those uses. The ordinance prohibition here is on having two principal uses on one lot," and emphasized that plaintiff "failed to reconcile" the proposed variance "with the prohibition on more than one use per lot in the B-2 zone." The record supports the Board's finding that a d(1) variance could not be granted without substantial detriment to the public good especially as it related to traffic impact. Because plaintiff failed to establish the positive and negative criteria required by N.J.S.A. 40:55D-70, we discern no reason to reverse the Board's denial of the "d" variances.

Plaintiff also asserts that even assuming the variances were required, the Board's denial of them was arbitrary, capricious, and unreasonable, and the trial

court should have reversed on that basis alone. In light of our decision upholding the Board's denial of the conditional use and bulk variances, we need not address this issue. Further, plaintiff contends it satisfied the specific conditional use requirements for a gasoline fueling station under the Township's ordinance, which "contains six [g]eneral [c]onditions that all conditional uses permitted in Raritan Township have to meet." And, plaintiff claims this has nothing to do with the specific conditions for a gasoline fueling station, and it only applied for the six general conditions "to exhaust its administrative remedies." Again, we are unpersuaded.

Plaintiff also states the trial court "suggested" that it waived the argument. This is misleading, as the trial court found plaintiff did waive its challenge on "whether or not 'd(3)' variances were required by virtue of . . . plaintiff's conduct here and even by [its] invited error, the defendant's invited error." The court found that in plaintiff's initial application, it applied for d(3) variances.

"A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995). "Waiver is the voluntary relinquishment of a known right evidenced by a clear, unequivocal and decisive act from which an intention to relinquish the right can

49

be based." <u>Mitchell v. Alfred Hofmann, Inc.</u>, 48 N.J. Super. 396, 405 (App. Div. 1958). The invited error doctrine:

> [O]perates to bar a disappointed litigant from arguing on appeal that an adverse decision below was the product of error, when that party urged the lower court to adopt the proposition now alleged to be error. The rule is based on considerations of fairness and preservation of the integrity of the litigation process.
>
> [<u>Brett v. Great Am. Rec., Inc.</u>, 144 N.J. 479, 503 (1996).]

In support of the Board's assertion that plaintiff waived its right to challenge the d(3) variance, it cites <u>Chicalese v. Monroe Township Planning Board</u>, 334 N.J. Super. 413 (Law Div. 2000). In <u>Chicalese</u>, the trial court held plaintiffs waived their right to argue that subdivision approval was not required by applying to the planning board for such approval. <u>Id.</u> at 424. Here, plaintiff waived its right to challenge the Board's decision on the merits as to the d(3) variances when, in both its initial and final applications, plaintiff applied for d(3) variances. Counsel for plaintiff agreed during the June 6, 2019 hearing session plaintiff needed several d(3) variances for deviations from the "general conditions" applicable to all conditional uses under the ordinance. During closing argument, plaintiff's counsel agreed that d(3) variances from the ordinance regulations and requirements at issue were required. Additionally,

counsel agreed with the "jury charge" that the Board attorney had prepared, reserving the applicant's rights to contest only one issue, that a d(1) variance was not required.

Plaintiff further contends that the Board "should have treated the conditional use variances as bulk variances." It argues that "[t]he issue of incorporating all of the bulk requirements of a particular zone in a conditional use ordinance, or incorporating other ordinance provisions outside of the zoning ordinance in a conditional use ordinance, has long confused applicants, land use boards and commentators."

As to whether d(3) variances were required from general conditional use standards, the trial court found plaintiff provided no support, such as case law, for its assertion that no such variances were required. The trial court found that there was no confusion as to whether the standards for both d(3) variances and bulk variances had to be satisfied. Moreover, the court noted plaintiff's argument the general "conditional use standards applicable to all conditional uses demonstrates that the governing body did not intend for the general conditions for all the conditional uses to apply to the plaintiff's application when plaintiff's application met the specific conditions for a gas station" was contrary to the purposes of the ordinance and N.J.S.A. 40:55D-3 "to the designated

51

purposes of establishing conditional uses in the [T]ownship." The court further referenced the Board's decision on this issue and agreed with the Board's determination that the governing body enacted general conditional use standards because it did not feel "comfortable" with the specific conditional use standards "alone."

Plaintiff argues that the Board and the trial court were "confused" as to whether the standards for d(3) and bulk variances had to be satisfied, and thereby, misinterpreted the ordinance. We disagree.

Here, the Board members were knowledgeable about the community, the property, and well educated as to the ordinances. Additionally, the ordinance incorporated by reference the bulk regulations that plaintiff outlined in its Zoning Relief Table. An applicant who did not meet the bulk and site requirement would have to obtain d(3) variances and meet the stricter conditional use variance standard established in Coventry Square, Inc. v. Westwood Zoning Board of Adjustment, 138 N.J. 285, 298-99 (1994) (holding "a conditional-use variance applicant must show that the site will accommodate the problems associated with the use even though the proposal does not comply with the conditions the ordinance established to address those problems"). Thus, we conclude plaintiff's argument that it was not required to apply for d(3)

variances from the general conditional use standards is devoid of merit.

To the extent we have not addressed plaintiff's remaining arguments, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

The Board's resolution was adequate. It specified all of the exhibits and the portions of testimony the Board relied upon to make its factual findings and set forth the evidence and factual findings in detail. The Board made factual findings after considering all the evidence presented and explained how its findings supported its ultimate legal conclusions.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION